**KENTUCKY KINGDOM AMUSEMENT COMPANY (f/k/a Kentucky Kingdom, Inc.), Appellant/Cross–Appellee,**

v.

**BELO KENTUCKY, INC., d/b/a WHAS–TV (f/k/a Journal Broadcasting of Kentucky, Inc. d/b/a WHAS–TV), Appellee/ Cross–Appellant.**

No. 2002–SC–0693–DG, 2002–SC–0697–DG, 2003–SC–0634–DG.

Supreme Court of Kentucky.

Aug. 25, 2005.

Rehearing Denied Jan. 19, 2006.

Gaylee W. Gillim, Eric L. Ison, Melissa Norman Bork, Greenbaum, Doll & McDonald, Edmund Karem, Sitlinger, McGlincy, Steiner, Theiler & Karem, Ann B. Oldfather, Lea A. Player, Oldfather & Morris, Louisville, Counsel for Appellant/Cross–Appellee.

John L. Tate, Bethany A. Breetz, Stites & Harbison, Louisville, Thomas Leatherbury, Lisa E. Bowlin, Vinson & Elkins, Dallas, TX, Counsel for Appellee/Cross–Appellant.

WINTERSHEIMER, Justice.

This appeal and cross-appeal are from an opinion of the Court of Appeals that reversed a judgment based on a jury verdict in a defamation action brought by Kentucky Kingdom against WHAS–TV. The jury originally returned a $3,975,000 verdict in the plaintiff's favor, but the $1 million award for damage to Kentucky Kingdom's reputation was set aside by the trial judge.

A number of issues relating to a defamation action brought by a public figure against a news media defendant are presented. They include: the proper appellate standard of review of the findings by a jury regarding "falsity" and "actual malice"; whether the individual defamatory statements are supported by the evidence; whether a single telecast, although not defamatory, may become so when combined with other telecasts; whether "professional journalistic standards" evidence is relevant and admissible; whether a corporate plaintiff may recover for both lost profits and injury to reputation; whether the jury must be instructed on the meaning of "false" and the evidentiary standard by which the plaintiff may recover punitive damages.

On July 26, 1994, five passengers were injured when two cars collided in the dark during the operation of Kentucky Kingdom's indoor steel roller coaster known as the "Starchaser." The Starchaser was a major ride attraction at the amusement park. It had been in operation at various parks for more than twenty years since its manufacture. A then 7–year–old passenger suffered the most serious injury, a lacerated liver. The collision and investigation attracted immediate and continuing news coverage from WHAS–TV and a

number of Louisville area television and radio stations as well as from the print media.

The collision occurred after a Starchaser operator discovered that two cars had climbed the initial lift chain at the same time and were speeding down the track very close together. The operator activated an emergency stop button, but the cars were sharing an area of the track between two automatic brake points. When the lead car stopped at the next brake point, the second car, which was not slowed by a brake, struck the rear of the lead car, injuring passengers in both cars.

WHAS–TV broadcasted several reports in 1994 and 1996 regarding the accident and Kentucky Kingdom alleged that three statements made during those reports were libelous. First, after interviewing a passenger in one of the cars who stated: "I mean everybody should know about how dangerous this ride is," WHAS–TV's reporter stated: "State inspectors also think the ride is too dangerous." The second defamatory statement occurred during a story about the expected reopening of the Starchaser and referred to the ride as "the roller coaster ride that malfunctioned earlier this week." Kentucky Kingdom claims that the third defamation occurred several years later when, describing evidence in a lawsuit filed on behalf of the injured passenger, WHAS–TV libelously reported, "Kentucky Kingdom removed a key component of the ride."

In the trial of the defamation action, Kentucky Kingdom introduced evidence which in its opinion showed that all three of these statements were false and that WHAS–TV had made the statements knowing they were false or with reckless disregard as to whether they were false. The trial judge instructed the jury that it could find liability for the specific statements and/or the telecasts in which state-ments were made, "taken as a whole." The jury actually found that each of the statements and each series of telecasts taken as a whole were defamatory. The damages award was not broken down so as to indicate specific damages for specific statements or telecasts.

The jury awarded Kentucky Kingdom $100,000 for lost profits in 1994; $375,000 for lost profits in 1996; one million dollars for damages to reputation; and $2.5 million in punitive damages. The trial judge granted a judgment notwithstanding the verdict with respect to the reputation damages, determining that any such loss beyond loss of profits was necessarily speculative. WHAS–TV appealed on various issues of liability, instructions and damages. Kentucky Kingdom cross-appealed in order to regain its one million dollars for injury to reputation. The Court of Appeals reversed and remanded for a new trial.

The Court of Appeals determined that the evidence clearly and convincingly established actual malice regarding the "too dangerous" comment. It was not convinced that WHAS–TV had acted with actual malice regarding the statements "the ride that malfunctioned" and "removed a key component." Because the damages award did not differentiate between the claim that was judged valid and those considered unsupported, the Court of Appeals directed that a new trial was required. The panel also held that Kentucky Kingdom could recover general damages for injury to its reputation in addition to special damages for lost profits. However, it determined that a new trial would be necessary to determine such damages because the amount awarded by the jury did not itemize sufficiently proven claims and those which were insufficient.

The Court of Appeals offered guidance to the trial judge on remand. First, it

determined that Kentucky Kingdom's journalism-ethics expert was properly allowed to testify that WHAS–TV had violated professional standards. Next, the Court of Appeals advised that the "telecast taken as a whole" instructions were not presumptively erroneous because a single telecast, while not defamatory, could become so when combined with other telecasts. It also believed that Kentucky Kingdom had established its lost profits with reasonable certainty through its accountant's analysis of lost attendance and diminished profits.

The Court of Appeals agreed with WHAS–TV that the jury should be instructed that the comments or telecasts only had to be "substantially true." It found that including language from KRS 411.061 in the punitive damages instruction was superfluous. Finally, the Court of Appeals concluded that proof of actual malice so as to permit recovery at all would necessarily constitute proof sufficient to support an award of punitive damages. This Court accepted discretionary review.

## I. Standard of Review

■ The constitutional standard of review applicable to a defamation case relates only to the findings of actual malice and not to other parts of the verdict. There is no constitutional requirement for a heightened review of the determination by the jury that the statements at issue are false or defamatory.

Section 8 of the Kentucky Constitution, "Freedom of speech and of the press," provides in relevant part as follows:

> Every person may freely and fully speak, write and print on any subject, being responsible for abuse of that liberty.

■ It is Kentucky law, consonant with the federal First Amendment, which governs the right to recover for defamation. *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684 (Ky.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). The constitutional requirement is that actual malice must be shown by clear and convincing evidence. The determination by the jury as to this aspect is independently reviewed.

*Ball, supra*, illustrates that the only part of the record on which this Court conducted an independent review was on the question of actual malice. This Court recognized in *Ball* that a court reviewing disputed facts on which a jury had already decided that actual malice existed, must accept the verdict of the jury. The Court stated:

> We accept the jury's finding as to disputed facts when there is supporting evidence because we claim no superior ability to divine the truth by reason of judicial office, and we question the good judgment of any judge who thinks he has such special powers.

*Ball*, 801 S.W.2d at 688.

■ In *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), it was the finding of actual malice that the United States Supreme Court subjected to a standard of constitutional review. The U.S. Supreme Court did not disturb the use of the clearly erroneous standard of review on a finding of falsity. *See also Bartimo v. Horsemen's Benevolent & Protective Ass'n*, 771 F.2d 894 (5th Cir.1985). *Bose, supra*, indicated that in reviewing whether actual malice existed, the Court must examine the evidence and independently determine whether the judgment is supported by clear and convincing proof of actual malice. The finding of actual malice is subject to independent review by an appellate court. Not all findings of fact in an actual malice

matter are subject to *de novo* review. As observed in *Bose:*

> Indeed, it is not actually necessary to review the 'entire record' to fulfill the function of independent appellate review on the actual-malice question; rather, only those portions of the record which relate to the actual-malice determination must be independently assessed.

466 U.S. at 514, 104 S.Ct. 1949, 1967 FN 31.

Similarly, the U.S. Supreme Court in *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), recognized that the falsity and defamation elements are based on common law libel not affected by the constitutional element of actual malice. The U.S. Supreme Court noted that "whether the 'intellectual gigolo' quotation is defamatory is a question of California law. To the extent that the Court of Appeals based its conclusion on the First Amendment, it was mistaken." *Masson, supra* at 522, 2436, 111 S.Ct. 2419.

It is beyond question that the function of the jury in interpreting the evidence and finding the ultimate facts is a fundamental American tradition which should merit constitutional recognition. *Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382 (Ky.1985). Clearly, the sanctity of the jury verdict is fundamental in our judicial system. *Hanson v. American Nat'l Bank & Trust Co.,* 865 S.W.2d 302 (Ky.1993). *See also Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). In considering all the evidence of actual malice, we must accept all subsidiary facts that the jury could have found, including those disputed facts which constitute the proof of actual malice.

## II. Actual Malice

■■ It is the obligation of this Court to review all evidence of malice in the record even beyond the words actually spoken. As to whether malice was shown by the falsity of the word spoken alone, the United States Supreme Court has indicated that where the record contains substantial additional evidence, it should also be considered in an independent review. *Masson* at 521, 2435, 111 S.Ct. 2419. Following the suggestions of *Masson,* a review of this evidence in a light most favorable to this plaintiff indicates that this Court should consider the natural and probable effect of the words on the mind of the average listener, and not subject them to "critical analysis of the legal mind." *See McCall v. Courier–Journal & Louisville Times Co.,* 623 S.W.2d 882 (Ky.1981), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982). Proof of actual malice is frequently circumstantial so that the reckless disregard of truth or falsity or the actual knowledge of falsity can generally be inferred only, rather than proven directly. As noted in *Harte–Hanks, supra,* the plaintiff is entitled to prove the state of mind of the defendant through circumstantial evidence. *See also Warford v. Lexington Herald–Leader Co.,* 789 S.W.2d 758 (Ky.1990).

■ Kentucky Kingdom has gone to considerable detail in its brief to recite a variety of factual situations indicating actual malice. Among other items of evidence are the following three examples: 1) WHAS–TV broadcast the "too dangerous" allegation after it received specific knowledge that the claim was false and after flagging its scripts questioning the accuracy; 2) It broadcast that the "ride malfunctioned" three times after its own records reflected that state inspectors had not said the ride malfunctioned, and twice after acknowledging to the amusement park

that this charge was wrong and that it would be corrected; and 3) The reporter for the TV station admitted that his "removed a key component" report concerning the dispatch motor brake was false and that he misrepresented a tire motor brake as a reducing brake that stops the cars.

Certainly, the burden on a plaintiff in a libel action is significant. The evidence presented by Kentucky Kingdom sufficiently demonstrated that there was clear and convincing evidence of actual malice. The proof submitted was more than adequate.

### III. Broadcasts as a Whole

▌ A jury in this type of action must consider the broadcasts in their entirety when determining whether the statements and inferences within it are false and defamatory. *Ball,* 801 S.W.2d at 688. A defamatory publication must be considered as a whole because the cumulative effect of the facts may support the finding by the jury of actual malice. *See Mucci v. Dayton Newspapers, Inc.,* 71 Ohio Misc.2d 71, 654 N.E.2d 1068 (Ohio Com.Pl.1995). In *Ball,* the jury was asked to consider the entire publication, some of which contained false and defamatory material and some of which did not. *Ball,* 801 S.W.2d at 686 (a related article which was not in itself defamatory was significant as it related to the malice which can be inferred from the heavy-handed way in which it was written.) *See also Harte–Hanks.*

This case is full of evidence from which the jury could conclude that WHAS–TV acted with actual malice. Among the evidence was the following: that there was a failure to correct any inaccuracies; that there was a continuing commitment to running and rerunning the same story line; that there was a significant failure to investigate or verify credibility; and the

general makeup and presentation of the story exhibited hostility. A reasonable trier of fact could determine that there was defamation. *Cf. Yancey v. Hamilton,* 786 S.W.2d 854 (Ky.1989).

### IV. "Not Substantially True"

▌ The use of the word "false" in the instructions in this case was recognized by this Court in *Ball* and noted with approval by the United States Supreme Court in *Harte–Hanks.* WHAS–TV contends that the broadcasts were substantially true and that the instructions given to the jury should have reflected that kind of situation. We cannot agree.

Any reliance by WHAS–TV on *Bell v. Courier–Journal & Louisville Times Co.,* 402 S.W.2d 84 (Ky.1966), is misplaced. That case is a common law defamation and contains no discussion of any First Amendment issues. It is a holding on summary judgment that the testimony of the plaintiff showed the truth of each item published. The court in that case characterized the truth as "at least substantially true." That is not the situation here where a jury has determined that the statements and implications of the story were false and defamatory. *E.W. Scripps Co. v. Cholmondelay,* 569 S.W.2d 700 (Ky.App.1978), instructed the jury to determine if the publications were "false." In response to the contention that the article was "substantially true" the court indicated that there was certainly substantial evidence for the jury to find that the article was false.

▌ The doctrine of "substantially true" is a convenient and necessary phrase invented by lawyers and judges to apply in very narrow and limited circumstances and relates only to incidental information and not to essential content. *Bell, supra,* states that a newspaper is not to be held to exact facts or to the most minute details of

the transaction it reports, but only to what is "substantially true." That is not the case here. Truth is a relatively easy concept to ascertain. It is generally defined as accuracy or correctness. Here, the broadcasts were fundamentally inaccurate as it related to the comments "too dangerous," "ride malfunctioned" and "removed a key component." Truth as contrasted to falsehood is the basis for a defamation claim.

 Further, an instruction that defines falsity as "not substantially true" would be in contradiction to the barebones approach used in jury instructions in Kentucky. *See Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814 (Ky.1992). It is well settled that the meaning of the instructions may be developed during closing argument. The legal authorities relied upon by WHAS–TV are unconvincing.

### V. Damages

 The verdict of the jury as to compensatory damages for loss of profits was supported by the evidence presented at trial. On the question of loss of reputation by a corporation, in addition to specific damages for loss of profit, we agree with the order of the circuit court in setting aside that part of the jury verdict due to a loss of reputation. It may well be that a corporation could suffer loss of reputation, but in this case, the jury had to speculate on anything other than the loss of profits. Thus, the judgment notwithstanding the verdict on that issue only was correct. Furthermore, under the standards set out in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), the amount of punitive damages is consistent with compensatory damages even when the adjustment is made for a deletion of the loss of reputation award.

### VI. Other Issues

 We find no error in the instructions on punitive damages given to the jury. In this case, the jury found actual malice and also malice and oppression as those terms are defined in KRS 411.184, all by clear and convincing evidence. There was no error in the inclusion of the KRS 411.061 language in the instructions. Nor is there any basis to reverse the jury's verdict on this ground.

 The journalism expert was properly allowed to testify about journalism standards and ethics. Actual malice cannot be based solely on expert evidence that WHAS–TV deviated from accepted journalistic practices. *Harte–Hanks.* However, a journalism expert's testimony may assist the fact-finder in understanding the circumstantial evidence of actual malice. Consequently, the trial judge did not err in admitting the testimony of the journalism expert.

 Media and broadcast outlets have no First Amendment protection to publish false information with actual malice. Those who do so must be accountable for the damages caused by their actions. Here, the jury found against WHAS–TV on all of the controverted facts. The necessity to make an independent review of the record does not include a fiat to substitute the reviewing authority's opinion for that of the jury.

It is the decision of this Court that the opinion of the Court of Appeals is reversed, and the judgment of the circuit court is reinstated.

LAMBERT, C.J., JOHNSTONE and SCOTT, JJ., concur.

COOPER, J., dissents in part by separate opinion and is joined by GRAVES, J.

ROACH, J., also dissents in part by separate opinion.

COOPER, Justice, dissenting in part.

I concur in the majority opinion only insofar as it reinstates the trial court's judgment notwithstanding the verdict (JNOV) with respect to the $1,000,000.00 verdict for reputation damages. However, I conclude that Belo Kentucky, Inc., d/b/a WHAS–TV ("WHAS") was also entitled to a JNOV with respect to the remainder of the damages because the statements deemed defamatory by the jury were absolutely privileged. Alternatively, WHAS is entitled to a new trial because the trial court's jury instructions did not accurately state the law of the case. Furthermore, the punitive damage award was excessive under the guidelines established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

## I. FACTS.

Kentucky Kingdom Amusement Company operates an amusement park on the premises of the Kentucky state fairgrounds in Louisville, Kentucky. For several years, it operated a twenty-year-old Jet Star II model indoor roller coaster dubbed the "Starchaser." On July 26, 1994, one of the Starchaser's coaster cars rear-ended another coaster car, injuring several passengers, including seven-year-old Mary Noonan, who sustained a lacerated liver. The incident received widespread local news coverage, including three televised broadcasts by WHAS that are the subject of this defamation action. Noonan also filed a personal injury action against Kentucky Kingdom. The two lawsuits proceeded almost simultaneously with many of the same witnesses giving discovery depositions in both cases, either to prove or disprove the negligence of

Kentucky Kingdom in Noonan's personal injury action, or to prove the truth or falsity of the statements made by WHAS in this defamation action.

Kentucky Kingdom's customers enter the Starchaser's coaster cars at a "loading station." A "dispatch brake" is raised from the center of the track so as to contact the brake pan on the underside of the car and hold the car in place. Until 1994, this brake was operated by an electric motor that was activated when the "loader operator" pressed down on a button labeled "brake." After the car was loaded, the loader operator would push the "car ready" button to notify the "tower operator" that the car was ready for dispatch. The tower operator would then press the "dispatch" button to activate the "dispatch tire," a wheel located in the middle of the track just around a bend from the loading station. However, the dispatch tire also had a brake that remained locked until the loader operator pressed the "brake" button, which both (1) released the dispatch brake so that the car could begin moving, and (2) released the dispatch tire's brake, so that the tire could begin spinning in place. The loader operator would then push the car forward while continuing to hold down the brake button until the car passed over the dispatch brake, whereupon the operator would release the brake button, causing the dispatch brake to reactivate (rise) in order to stop and hold the next car in line.

Once past the dispatch brake, a loaded car rolls around the bend to the spinning dispatch tire which contacts the car's brake pan and propels the car forward past the "proximity switch," which turns off the dispatch tire, and onto a "second kick" or "booster" tire which guides the car onto the lift chain. The lift chain pulls the car to the top of a steep incline from where the tracks drop precipitously, caus-

ing the car to be propelled around the track by gravitationally induced coasting. As the car nears the station at the end of the trip, it is slowed by "station brakes" and stopped by a "safety brake" and an "unloading brake." An "unloader operator" activates these two motorized brakes by pushing buttons labeled "safety brake" and "unload brake." Like the dispatch brake, the unloading brake is located in the center of the track and holds the car in place while the passengers disembark. Once all the passengers have exited the car, the operator presses and holds down the unload brake button to disengage the unloading brake while pushing the car forward until it passes over the brake. The car then rolls forward into the loading area where it is stopped by the dispatch brake. Additional "emergency brakes" located at various points along the track can be activated to stop a car mid-trip in case of an emergency. These brakes can be activated either by the tower operator or by an operator situated below the tracks "in the hole."

Kentucky Kingdom had experienced problems with the dispatch brake during the summer of 1993, resulting in cars being prematurely released from the loading area and, on one occasion, causing a rear-end collision similar to the one that occurred on July 26, 1994. Another accident occurred on July 24, 1994, when a car failed to stop at the unloading station. There was evidence that one or both of these prior accidents occurred because the brake pans on the cars were so worn that they did not make proper contact with the dispatch or unloading brake. However, Thomas Pardue, Kentucky Kingdom's technical services manager, attributed both accidents to "operator error." Specifically, he concluded that the July 24, 1994, accident was caused by the failure of the unloader operator to activate the safety and unloading brakes.

Prior to the 1994 season, Kentucky Kingdom hired a local machine shop to rebuild the motors that operated the motorized brakes. Pardue subsequently "lost confidence" in the dispatch brake's motor and disengaged it. Thereafter, the loader operator was required to manually engage and disengage the dispatch brake. The disengagement of the electric motor also disengaged the brake on the dispatch tire. However, the loader operator still needed to press the "car ready" button to notify the tower operator to activate the dispatch tire.

Brian Harkness was the operator "in the hole" on the afternoon of July 26, 1994. When he observed two cars descending from the top of the initial incline no more than thirty to forty feet apart, he attempted to stop the second car with one of the safety brakes in order to hold it until the first car was safely down the track. Unfortunately, he activated the brake too soon, stopping the first car and causing it to be rear-ended by the second car.

After the injured customers were removed from the scene, Pardue and other technical services personnel attempted to determine the cause of the accident. They ultimately concluded, as they had with respect to the previous accidents, that this accident was caused by operator error. Their theory was as follows: After loading the first car, the loader operator manually disengaged the dispatch brake and pushed the car forward toward the dispatch tire. However, he forgot to push the "car ready" button, so the dispatch tire was never activated. Because the dispatch tire's brake had been previously disengaged, the car rolled over the idle dispatch tire and stopped at a point somewhere between it and the proximity switch, out of the loader operator's view. The loader operator then loaded the second car, disen-

gaged the dispatch brake, and pushed the "car ready" button, causing the tower operator to activate the dispatch tire. When the second car reached the spinning dispatch tire, it was propelled into the rear of the first car so that both cars reached the lift chain at approximately the same time and were pulled to the top of the incline, the second car close behind the first.

In a deposition given in the Noonan personal injury action on April 4, 1996, Pardue testified that had the dispatch brake's motor been operational, the dispatch tire would have been locked and would have stopped the first car while it was still visible to the loader operator.

Q. In this case, Mr. Pardue, if the brake had been working and in place, as I understand it, even if the operator had made the mistake, if you will, or was able to release the car from the unloading area in to the—towards the first tire, the dispatch tire, had the brake been working and the tire been held in place, that first car would not—or, excuse me, the second car—the first car would not have gone over the tire, correct?

A. That's correct.

Q. So with the original dispatch system brake activated, the accident sequence involving Mary Noonan could not have occurred, correct?

A. If everything was operational -

Q. (Interrupting) Okay.

A. (Continuing)—that's correct.

Inspection and regulation of amusement rides is the responsibility of the Department of Agriculture. As required by administrative regulation, Kentucky Kingdom notified the local inspector, Carl Dills, Jr., of the accident. Following his inspection at the scene, Dills issued a "stop operation order" that reads as follows:

STOP OPERATION ORDER
Kentucky Department of Agriculture
206 W. 2nd St.
Frankfort, Ky 40601
(502) 564-4870

Issued to: Kentucky Kingdom
Resp. Person: Ron Bernie
Address: Kentucky State Fairgrounds
Louisville, Kentucky

You are hereby notified that the following described ride or attraction, Starchaser (Jet Star II), is operating in violation of KRS 247.232—KRS 247.236 and/or the regulations of the Kentucky Department of Agriculture. The specific violation is: KRS 247.324—*Point of safety not corrected.*

You are hereby advised and instructed that the foregoing violation cannot be corrected immediately. You must immediately take steps to correct this violation.

This stop operation order issued at Louisville, Kentucky on the 26th day of July 1994 by: /s/_____
Inspector

 Inspector

Action Taken: Factory to be notified for advice on dispatch safety. *Safety to be incorporated to insure that no vehicle can be released from station till advance vehicle has past [sic] first brake past lift chain.* Install mirror in dispatch area in order that operators can view lift chain area. Notify Dept. of Agriculture when Starchaser is ready for re-inspection.

(Emphasis added.)

Between July 27 and July 29, 1994, Kentucky Kingdom's technical services personnel spent twenty-six man hours performing repairs on the Starchaser. At the conclusion of the repairs, a handwritten report entitled "Kentucky Kingdom Technical Services Project Report" was prepared. That report reads as follows:

Project: *Modify Safety System,* Weld, *Repair brake on # 2 kickmater* [sic] [apparently the dispatch tire], Install mir-

ror, Move override button. Replace seat belts. Repair metal on rear of car. Test Cars on all brakes. Test Operations.

(Work performed) *Wired loading [dispatch] brake in with # 2 dispatch tire. Repaired # 2 tires [sic] brake. Installed mirror so operator could see Chain & Tires.* Removed station override button From control box. Welded spredder [sic] bar. Welded ear on jackstand. Welded Fence in Front of track in hole. Replaced Seat belts on all cars. Repaired Pop Rivits [sic] on rear metal on Cars. Tested All Cars on brakes on track (State Inspector was there). Test Operation.

Parts Used: 8 sets of seat belts./ 1 brake disc. /1 section of Fencing./ 1 mirror.

(Emphasis added.)

## II. ALLEGED DEFAMATION.

The importance of the constitutionally protected freedom of the press cannot be understated:

> The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrument of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgment of the publicity afforded by a free press cannot be regarded otherwise than with grave concern.... A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.

*Grosjean v. Am. Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). Judicial decisions touching on freedom of the press "emphasize the special and constitutionally recognized role of that institution in informing and educating the public, offering criticism, and providing a forum for discussion and debate." *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 781, 98 S.Ct. 1407, 1418, 55 L.Ed.2d 707 (1978). Because of the importance of this role, the function of the press is "precisely that form of speech which the Framers of the Bill of Rights were most anxious to protect—speech that is 'indispensable to the discovery and spread of political truth.'" *Fed. Communications Comm'n v. League of Women Voters of Cal.,* 468 U.S. 364, 383, 104 S.Ct. 3106, 3119, 82 L.Ed.2d 278 (1984) (quoting *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)). Thus, the constitutional guarantee of freedom of the press must be safeguarded not simply for the benefit of the press, but for the benefit of the citizenry at large. *Red Lion Broad. Co. v. Fed. Communications Comm'n,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–07, 23 L.Ed.2d 371 (1969); *Time, Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967).

"Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 686, 109 S.Ct. 2678, 2695, 105 L.Ed.2d 562 (1989) (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974)). Therefore, to ensure that the freedom of the press is protected when implicated by a defamation claim regarding a public matter, a plaintiff may only recover damages upon a showing that the allegedly defamatory statement was made with "actual malice." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686

(1964). This standard is predicated upon a recognition that "erroneous statement is inevitable in free debate," *id.* at 271, 84 S.Ct. at 721, and that punishment for good faith error would create strong incentives for self-censorship, thereby inhibiting legitimate exercises of the freedom of speech and of the press. *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007. The fact that erroneous publications are sometimes protected under the "actual malice" standard is a testament to the commitment of our nation's courts to the preservation of a vibrant press. *E.g., St. Amant v. Thompson*, 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968).

Kentucky Kingdom admits that it is a public figure and does not deny that the collision of two roller coaster cars, which caused personal injuries to its paying customers, was a matter of public interest and concern. Viewing isolated statements out of context, the majority opinion concludes, in cursory fashion, that the broadcasts cited by Kentucky Kingdom were made with actual malice. *Ante,* at 791. However, upon examination of the broadcasts in full context, it is impossible to conclude that the broadcasts were made with actual malice, because they were substantially true.

> Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified. Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced. Our definition of actual malice relies upon this historical understanding.

*Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (internal citations and quotations omitted).

The first statement found to be defamatory by the majority opinion occurred during WHAS's 6:00 p.m. newscast on July 27, 1994. The reporter summarized the Starchaser accident, updated the status of those injured, stated that state officials had ordered changes made to the Starchaser, *and reported that Kentucky Kingdom believed the cause of the accident was operator error.* The reporter then interviewed one of the passengers on the Starchaser at the time the collision occurred. This person stated: "I mean everybody should know about how dangerous this ride is." The reporter then continued:

> State inspectors also think the ride is too dangerous. They ordered the park to make brake improvements and to install mirrors *to help the ride operators avoid releasing cars too soon, the reason yesterday's accident happened.*

(Emphasis added.)

The second statement the majority opinion finds defamatory occurred during WHAS's 11:00 p.m. newscast on July 30, 1994. While reporting on the expected reopening of the Starchaser, the reporter referred to it as "the roller coaster ride that malfunctioned earlier this week."

The majority opinion next recites that "WHAS–TV libelously reported, 'Kentucky Kingdom removed a key component of the ride.'" *Ante,* at 788. Actually, the majority opinion is referring to a series of broadcasts aired in 1996 about the upcoming trial of Noonan's personal injury action. What the reporter actually said was that "public court documents" in the Noonan case revealed important information about a "key component" of the ride; that Kentucky Kingdom's technical services manager "says they disabled a brake that he even points out in the deposition may have prevented the scenario leading up to Noonan's crash." In another segment, the reporter stated that "new information filed in court documents shows that a component of the ride was removed by the park

and the park's own technical services manager now says that component, had it been there, may have prevented the scenario that led to Mary Noonan's crash."

At common law, even without taking First Amendment considerations into account, truth was an absolute defense to a civil defamation suit. *See, e.g.,* Restatement (Second) of the Law of Torts § 581A (1977) ("One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true."). *A fortiori,* where, as here, the defendant is a news media organization and it is undisputed that the plaintiff is a public figure and that the defendant's broadcasts concerned a public matter, the truth of the broadcasts bars any recovery. In fact, in such circumstances, the plaintiff bears the burden of establishing falsehood. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990) ("[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved."); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776–77, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986) ("To ensure that true speech on matters of public concern is not deterred, we hold that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern.").

Even an inaccurate statement in a news report is not defamatory if it is "substantially true" or a "rational interpretation" of known facts. The "rational interpretation" test allows the author an interpretive license that is necessary when relying upon ambiguous sources, so long as the report does not purport to be a verbatim recitation of a speaker's statement. *Masson,* 501 U.S. at 519, 111 S.Ct. at 2434 ("The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources."). The "rational interpretation" test originated in *Time, Inc. v. Pape,* 401 U.S. 279, 291, 91 S.Ct. 633, 640, 28 L.Ed.2d 45 (1971) (recognizing a "constitutional zone of protection" for errors of interpretation, for otherwise, "once a jury was satisfied that the interpretation was 'wrong,' the error itself would be sufficient to justify a verdict for the plaintiff"). In *Pape,* the plaintiff claimed a magazine article was libelous because of its failure to use the word "alleged" in repeating a government report's descriptions of police brutality.

> Time's omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under New York Times. To permit the malice issue to go to the jury because of the omission of a word like "alleged," despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact.

*Id.* at 290, 91 S.Ct. at 639. *See also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (holding, in a product disparagement case, that where "adoption of the language chosen was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer," plaintiff could not establish actual malice); *S. Air Transp.,*

*Inc. v. Am. Broad. Co., Inc.*, 678 F.Supp. 8, 11–12 (D.D.C.1988) (holding that if the truth of the statement can be reasonably inferred from proven facts, it is not defamatory).

The "substantially true" test has been recognized in Kentucky for many years. *Bell v. Courier–Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky.1966); *State Journal Co. v. Redding*, 175 Ky. 388, 194 S.W. 301, 303 (1917); *Pearce v. Courier–Journal*, 683 S.W.2d 633, 635 (Ky.App. 1985). Remarkably, the majority opinion summarily dismisses *Bell* as a "common law" case that has no application to the First Amendment, *ante*, at 791, a distinction that is mystifying in light of the fact that our common law of defamation cannot detract from the protections afforded to the news media by the First Amendment.[1] These First Amendment protections are implicated whenever a plaintiff seeks damages against a media defendant for speech of public concern. *Philadelphia Newspapers*, 475 U.S. at 776, 106 S.Ct. at 1563 (recognizing "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault."). Moreover, *Bell* was a defamation action against a newspaper, and is thus indistinguishable from the case *sub judice*. Our predecessor court specifically held that the "substantially true" test applied to newspapers. *Bell*, 402 S.W.2d at 87 ("Where the defendant is a newspaper, the rule is that it is not to be held to the exact facts or to the most minute details of the transactions that it reports. What the law requires is that the publication be substantially true."). *See also* Restatement (Second) of Torts § 581A cmt. f (1977) ("It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."). Accordingly, application of the "substantially true" test is not only required by our common law, but is also mandated by the United States Constitution.

With respect to the statement that "State inspectors also think the ride is too dangerous," Kentucky Kingdom claims the statement is false because no state inspector *actually said* that the ride was "too dangerous." Of course, WHAS did not say that a state inspector *said* the ride was "too dangerous." WHAS reported only that state inspectors *think* the ride was too dangerous, a rational interpretation that could be drawn from the fact that Dills issued the "Stop Operation Order" because of the violation of a safety statute and ordered that it remain in effect until designated safety improvements were made. Even if Dills did not actually "think" the ride was "too dangerous, "[e]rrors of fact, particularly in regard to a man's mental states and processes, are inevitable." *New York Times*, 376 U.S. at 272, 84 S.Ct. at 722 (quoting *Sweeney v. Patterson*, 128 F.2d 457, 458 (D.C.Cir.1942)). WHAS's interpretation of Dills's action was both rational and substantially true, thus privileged as a matter of law.

With respect to the reference to "the ride that malfunctioned," Kentucky Kingdom asserts the statement was false because the accident was caused by operator error, not equipment malfunction. However, Pardue admitted that the operator error would not have occurred except for the malfunction and subsequent disengage-

---

1. The common law of Kentucky cannot be interpreted to supersede the requirements of the United States Constitution. *Prewitt v. Wilson*, 242 Ky. 231, 46 S.W.2d 90, 92 (1932) ("Judicial and legislative acts of a state ... impairing the rights of citizens under the Constitution of the United States are invalid and void."). Regardless, our predecessor court explicitly referred to the *New York Times* standard in *Bell*. 402 S.W.2d at 88.

ment of the dispatch brake, which also caused the dispatch tire's brake to malfunction. Furthermore, "malfunction" was an accurate description of an incident in which two roller coaster cars collided on the same track. Whether that malfunction was caused by operator error or equipment breakdown, the reporter's description of the accident as a "malfunction" was, as in *Bose*, " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." 466 U.S. at 512, 104 S.Ct. at 1966 (quoting *Pape*, 401 U.S. at 290, 91 S.Ct. at 639). At worst, the characterization was mere hyperbole, which is not actionable as defamation. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 285–86, 94 S.Ct. 2770, 2782, 41 L.Ed.2d 745 (1974) (language in union publications labeling nonunion letter carriers as "scabs" was "merely rhetorical hyperbole," not actionable as libel); *Greenbelt Co–op. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970) (newspaper's report of public debate characterizing real estate developer's negotiating tactics as "blackmail" held, as a matter of law, not libelous). The statement that the ride "malfunctioned" was substantially true and privileged as a matter of law. I would further note that WHAS had reported in its first broadcast that Kentucky Kingdom attributed the accident to operator error and that state inspectors ordered safety improvements "to help the ride operators avoid releasing cars too soon, the reason yesterday's accident happened."

As for the third statement, WHAS simply reported Pardue's testimony given in his deposition in the Noonan personal injury action, *i.e.*, that he disabled the dispatch brake motor because he had lost confidence in it, and that the accident would not have happened if the brake had been operational. An accurate report of a civil trial is protected speech. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 1044–45, 43 L.Ed.2d 328 (1975) ("With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.... The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized."). *See also Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1298–1300 (D.C.Cir.1988). Kentucky Kingdom objects to WHAS's characterization of the dispatch brake's motor as a "key component." However, if a properly functioning dispatch brake motor would have prevented this accident, as Pardue admitted under oath, characterizing it as a "key component" was substantially true and, thus, privileged as a matter of law.

Regrettably, today's majority opinion has imposed defamation liability for statements that are unmistakably substantially true when viewed in their full context.[2] The real tragedy of today's decision, however, is that it significantly diminishes the

---

2. Ironically, while the majority now holds that the statements "too dangerous," "ride that malfunctioned," and "removed a key component," were each malicious and fundamentally untrue, this Court has recently held that statements such as, "The City is Broke Because of His Management," "Frog Has Squandered Over 1½ Million Dollars of Surplus Money," "Think before you vote and wonder why Frog and his cronies are working so hard to get rid of people who have stood in his way and called his hand on illegal activities. FROG WAS SUCCESSFUL IN RUNNING OFF 62 SEPARATE COUNCIL MEMBERS IN DISGUST," to be lacking of malice and too indefinite, imprecise, and figurative to be considered false. *Welch v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724, 726, 730 (Ky.1999).

"breathing space," *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008, that is imperative for a vigorous and competent press. The majority's conclusions that these three broadcasts were "fundamentally inaccurate," *ante,* at 792, and were made with actual malice, *ante,* at 791, make no provision for substantially true speech, much less for the "constitutional zone of protection" required for rational interpretations of ambiguous source material, *Pape,* 401 U.S. at 291, 91 S.Ct. at 640, or for the fact that "erroneous statement is inevitable in free debate," *New York Times,* 376 U.S. at 271, 84 S.Ct. at 721. When defamation liability is imposed in a manner that reduces the news media's margin of error in covering public figures and matters of public concern, self-censorship by the media in its conduct of its most essential role is the inevitable result.

> The Constitution specifically selected the press ... to play an important role in the discussion of public affairs.... Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change ... muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.

*Mills v. State of Ala.,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966). The majority's departure from the protections provided by the First Amendment and our common law will have a deleterious effect on the openness of societal debate on public matters.

## III. JURY INSTRUCTIONS.

### A. Failure to Instruct on Substantial Truth.

At trial, WHAS tendered jury instructions that would have required the jury to determine whether each of the alleged defamatory statements was "substantially true." Instead, the trial court instructed the jury to return a verdict for Kentucky Kingdom if it found that the statements were false. As previously noted, the First Amendment precludes a defamation judgment against a media defendant premised upon statements that were "substantially true." *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1228 (7th Cir.1993) ("The rule making substantial truth a complete defense and the constitutional limitations on defamation suits coincide."). "Truth," in the context of a defamation action, has a particular meaning, *i.e.,* "substantially true," not "literally true."

"[W]e have found error in the failure to define terms when the law ascribes a particular meaning or when a common term is used as a term of art." *McKinney v. Heisel,* 947 S.W.2d 32, 34 (Ky.1997). *See also Blair v. Eblen,* 461 S.W.2d 370, 373 (Ky.1970); *Aetna Life Ins. Co. v. Shemwell,* 273 Ky. 264, 116 S.W.2d 328, 331 (1938); *Commonwealth Life Ins. Co. v. Ovesen,* 257 Ky. 622, 78 S.W.2d 745, 746 (1935). The majority disregards this requirement on the basis of our well-known preference for "bare bones" instructions. *Ante,* at 792. However, even "bare bones" instructions must contain an accurate and complete statement of the law; otherwise, the jury cannot properly apply the law to the facts of the case. *Risen v. Pierce,* 807 S.W.2d 945, 947–48 (Ky.1991).

In *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301–02 (2nd Cir.1986), the United States Court of Appeals for the Second Circuit approved the district court's first instruction to the jury, *viz:* "If the statement is true or substantially true, it cannot be libelous. It's not necessary of course that a statement be literally true." *Id.* at 301. However, the Court found a subsequent instruction to be erroneous because it "improperly permitted the jury to

disregard the substantial truth defense." *Id.* at 302. *See also Orr v. Argus–Press Co.*, 586 F.2d 1108, 1112 (6th Cir.1978) ("First, as the District Court instructed the jury, the article is not libelous if substantially true. 'To be true,' the Court correctly stated, 'it is not essential that the literal truth be established in every detail as long as the article contains the gist of the truth as ordinarily understood.' ").

In the case *sub judice*, the Court of Appeals correctly held that it was reversible error for the trial court to refuse to instruct the jury that "truth" means "substantial truth." *Cf. Harte–Hanks Communications*, 491 U.S. at 667 n. 7, 109 S.Ct. at 2685 n. 7 (trial court should instruct jury in such a manner to ensure that *New York Times* "actual malice" standard is correctly applied). Under the instructions as given, "once a jury was satisfied that the interpretation was 'wrong,' the error itself would be sufficient to justify a verdict for the plaintiff." *Pape*, 401 U.S. at 291, 91 S.Ct. at 640.

### B. *"Implied Libel" Instruction.*

Neither the Court of Appeals nor the majority opinion of this Court has discussed the propriety of the instruction that permitted the jury to find for Kentucky Kingdom if it believed that "[t]he WHAS Reports in July 1994, taken as a whole, conveyed and created false inferences or implications concerning Kentucky Kingdom and the management, maintenance and safety of the amusement park." However, "an allegedly false implication arising out of true statements is generally not actionable in defamation by a public official . . . ." *Diesen v. Hessburg*, 455 N.W.2d 446, 452 (Minn.1990). *See also Strada v. Conn. Newspapers, Inc.*, 193 Conn. 313, 477 A.2d 1005, 1011 (1984) ("A publisher cannot be responsible for every strained interpretation that a plaintiff might attribute to its

words."); *Schaefer v. Lynch*, 406 So.2d 185, 188 (La.1981); *Mihalik v. Duprey*, 11 Mass.App.Ct. 602, 417 N.E.2d 1238, 1241 (1981) (insinuating overtone insufficient to constitute libel of public figure); *DeFalco v. Anderson*, 209 N.J.Super. 99, 506 A.2d 1280, 1284 (Ct.App.Div.1986); C. Thomas Dienes & Lee Levine, *Implied Libel, Defamatory Meaning, and State of Mind: The Promise of New York Times Co. v. Sullivan*, 78 Iowa L.Rev. 237, 305 (1993) ("There are an increasing number of cases that at least purport to reject a cause of action based upon an implied libel when the plaintiff is a public figure and the expression at issue involves a matter of public concern.").

Even jurisdictions that do not adhere to this general rule define "implied libel" as a publication that "convey[s] a substantially false and defamatory impression by omitting material facts or suggestively juxtaposing true facts." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex.2000). *See also Toney v. WCCO Television, Midwest Cable and Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir.1996) ("[T]he touchstone of implied defamation claims is an artificial juxtaposition of two true statements or the material omission of facts that would render the challenged statement(s) non-defamatory."). Kentucky Kingdom does not identify any material omissions or juxtapositions in the WHAS broadcasts that could give rise to a claim of "implied libel." It simply asserts that the three statements claimed to be libelous are not true. The "taken as a whole" instruction should have been deleted from the jury instructions.

### IV. PUNITIVE DAMAGES.

The award of $2,500,000.00 in punitive damages exceeds the amount authorized by the compensatory damages award of $475,000.00. In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589,

134 L.Ed.2d 809 (1996), the United States Supreme Court identified three guideposts for determining whether an award of punitive damages is excessive: the degree of reprehensibility, the disparity between the harm suffered and the amount of the punitive damages award, and the difference between the punitive damages and the civil penalty authorized in comparable cases, with the degree of reprehensibility being the most important indicia of reasonableness. *Id.* at 575, 116 S.Ct. at 1598–99.

In *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the Court held that one factor to be considered in determining the degree of reprehensibility was "whether the harm caused was physical as opposed to economic," *id.* at 419, 123 S.Ct. at 1521, and that "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages ...." *Id. Campbell* pointed out that "[i]n *Haslip,* ... we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," *id.* at 425, 123 S.Ct. at 1524 (citing *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1 (1991)), and noted that "[w]e cited that 4 to 1 ratio again in *Gore,*" and "further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *Id.* (citing *Gore,* 517 U.S. at 581, 116 S.Ct. at 1589).

> While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution ....

*Id.* (citing *Gore,* 517 U.S. at 582, 116 S.Ct. at 1589).

Both *Gore* and *Haslip,* like the case *sub judice,* involved claims only for economic damage. In *Campbell,* which did not involve a personal injury *per se,* but did involve damages for intentional infliction of emotional distress, the Court held that the appropriate award of punitive damages would be "at or near the amount of compensatory damages." *Id.* at 429, 123 S.Ct. at 1526. Here, even if the statements WHAS made about the Starchaser accident had not been substantially true, it was highly speculative that they caused *any more* economic damage to Kentucky Kingdom than would have resulted if WHAS had merely reported that two roller coaster cars collided, causing a life-threatening injury to a seven-year-old child, and that the ride had been shut down by state inspectors for safety violations. From those "literally true" facts, WHAS's viewers probably would have concluded for themselves that a key component of the roller coaster malfunctioned and that the inspectors shut it down because they thought it was unsafe. *Cf. Masson,* 501 U.S. at 517, 111 S.Ct. at 2433 ("[T]he statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.") (internal citation and quotation omitted). Under these circumstances, the award of compensatory damages was more than generous and the punitive damages award should have been "at or near" the same amount. *Campbell,* 538 U.S. at 429, 123 S.Ct. at 1526.

Accordingly, I dissent.

GRAVES, J., joins this opinion.

ROACH, Justice, dissenting in part.

After reviewing the record, the relevant case law, and literature on the subject of defamation, it has become clear that the

Supreme Court of West Virginia was correct when it observed that "the litigation of a cause of action for defamation can prove to be a daunting task for the most learned jurist or the most experienced counsel." *Pritt v. Republican National Committee,* 210 W.Va. 446,·557 S.E.2d 853, 861 (2001). With this in mind, however, I must respectfully dissent.

I concur only in the majority opinion's conclusion that the trial court's judgment notwithstanding the verdict for reputation damages was proper. I dissent because I believe that the Court of Appeals was correct in evaluating the actual malice element regarding the statements at issue. I also agree with Justice Cooper that the award of punitive damages was in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the clear directives of the United States Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), although I do not

agree with his conclusion on the proper amount of punitive damages.[1]

The United States Supreme Court has made clear that courts have an independent duty to analyze whether the statements in question were made with actual malice. In *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), the Court explained:

The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as actual mal-

---

1. This Court's duty to review punitive damages consistent with the Due Process Clause of the Fourteenth Amendment of the United States Constitution is not optional. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Even if we were persuaded that Justices Scalia, Thomas, and Ginsburg were correct in *Campbell* in their criticism of the use of the Due Process Clause to constrain the size of a punitive damages award, we are bound by the controlling opinion of the United States Supreme Court when they are interpreting the United States Constitution. *Gardner v. Commonwealth,* 642 S.W.2d 584, 586 (Ky.1982) ("We are bound by the Constitution and the construction given to it by the United States Supreme Court ...."); *see also Plumlee's Adm'x v. Citizen's Nat. Bank of Bowling Green,* 271 Ky. 226, 111 S.W.2d 607, 610 (1937) ("[I]t is firmly settled that inferior federal courts and all state courts are bound by the decisions of the United States Supreme Court upon all questions involving construction, interpretation, and application of Federal statutes."). Punitive damages awards must be analyzed through the filter of *Campbell, BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), as Justice Cooper does in his dissent. However, Justice Cooper states that the punitive damages award in this matter should be "at or near" the same amount of compensatory damages. Ante at 803. I do not believe that this case falls within *Campbell's* description of the type of case where the punitive damages can only equal compensatory damages. 538 U.S. at 425, 123 S.Ct. at 1524. Having reviewed the United States Supreme Court's Opinions in *Haslip, Campbell,* and *Gore,* I would find that the punitive award should be reduced to a two to one ratio.

ice—and, more particularly, reckless disregard—however, is not readily captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice.

*Id.* at 685–686, 109 S.Ct. at 2694–2695 (citations, internal quotation marks, and footnote omitted).

In explaining a court's duty, the Supreme Court explained:

In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses, the reviewing court must examine for itself the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect.

*Id.* at 688–689, 109 S.Ct. at 2696 (internal citations, quotation marks, and footnote omitted). Thus, we are required to independently evaluate whether the statements in question were made with actual malice.

On the other hand, we are not at liberty to review a jury's factual findings independently. *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 688 (Ky.1990) ("At least in deciding what are the so-called underlying, subsidiary or historical facts, as contrasted with the finding of malice, where the evidence conflicts appellate review still must be in terms of what the jury could find as the true facts and what the jury could reasonably infer from the testimony of witnesses when considered as a whole. We accept the jury's finding as to disputed facts when there is supporting evidence because we claim no superior ability to divine the truth by reason of judicial office, and we question the good judgment of any judge who thinks he has such special powers." (citation omitted)); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499–500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984) (deferring to the trial court's findings of fact via application of the clearly erroneous standard under the federal rules in a defamation case). Instead, our review is limited.

I believe that there is supporting evidence as to the jury's findings: (i) that the Starchaser ride did not malfunction (the "Malfunction Statement"); (ii) that state inspectors did not think the Starchaser ride was too dangerous (the "Too Dangerous Statement"); and (iii) that Kentucky Kingdom did not remove a key component of the Starchaser ride (the "Removal Statement"). However, I agree with the Court of Appeals that there was not a sufficient showing of actual malice as to two of the statements.

### Malfunction Statement and Removal Statement

Based on the evidence at trial, a reasonable juror could conclude that the Star-

chaser ride did not malfunction and that operator error did not equate with ride malfunction. At trial, Kentucky Kingdom's CEO, Ed Hart, testified that the "ride never malfunctioned." WHAS–TV's corporate representative testified that the statement that the Starchaser ride malfunctioned was an "inaccurate statement." Additionally, the WHAS–TV reporter who covered the story testified that mechanical malfunction and human error are "two different things."

However, I agree with the Court of Appeals' finding that WHAS–TV did not know the Malfunction Statement was false at the time of its telecasts and that WHAS–TV did not act with a reckless disregard for the truth. The Court of Appeals explained:

> Kentucky Kingdom's characterization of the accident differed from WHAS–TV's. Kentucky Kingdom maintained that the ride did not malfunction, but rather that operator error caused the accident. Kentucky Kingdom informed WHAS–TV of its interpretation of what caused the accident. We do not believe, however, that this difference in characterization is sufficient to establish that the publisher [WHAS–TV] of the defamatory falsehood [had] entertained serious doubts as to the truth of the published matter. Accordingly, the evidence does not establish that WHAS–TV acted with actual malice.

Court of Appeals Opinion at 7 (alterations in original) (internal quotation marks and citation footnote omitted). Thus, the statement was not made with actual malice, and the jury's verdict as to this statement should be reversed.

I also believe that a reasonable juror could conclude that the Removal State-

ment was false. The Court of Appeals explained:

> In 1996, WHAS–TV reported that Kentucky Kingdom had removed a key component of the Starchaser. A WHAS–TV reporter gathered this information from deposition testimony given in the Noonan case and from a conversation he had with an employee of the company the reporter thought (incorrectly, as it turned out) had manufactured the ride. Kentucky Kingdom's technical services manager stated in his deposition that a brake on the Starchaser was not used. This brake was part of the ride's dispatch system. The employee informed the reporter that a braking system was necessary on the ride and the technical services manager stated that the accident would not have occurred if the brake was in use. Trial testimony revealed that there was some confusion as to what braking system the employee referred: the dispatch system brake or the reducing brakes. The WHAS–TV reporter testified at trial that the words "removed" and "key component" were his own words and that those words were inaccurate. Based on the foregoing, we believe that evidence, although conflicting, supports the jury's finding that the "removed a key component" report was false.

*Id.* at 7–8.[2]

Again, however, I agree with the Court of Appeals' holding that the statement was not made with actual malice. The Court of Appeals explained:

> Once again, however, we are unconvinced that WHAS–TV acted with actual malice. The reporter testified that he used those words to inform the audience

---

**2.** Kentucky Kingdom CEO, Ed Hart, also testified that the reducing brake and the dis-

patch motor brake were never removed.

that the brake was "removed from the process, removed from the procedure, was not being used." We do not believe that the distinction between "removed" and "did not use" is constitutionally sufficient to establish [actual malice].

*Id.* at 8–9.

Although I do not agree with Justice Cooper's conclusion as to the truth of the Malfunction Statement and the Removal Statement, I believe his discussion of the Malfunction Statement and Removal Statement further bolsters the conclusion that WHAS–TV did not make these two statements with actual malice. Thus, I would affirm the Court of Appeals and reverse the jury's verdict as to these two statements.

### Too Dangerous Statement

In WHAS–TV's first broadcast concerning the Starchaser ride on July 27, 1994, reporter Lisa Kiava interviewed a Kentucky Kingdom patron who stated, "I mean everybody should know about it, how dangerous this ride is. It should be closed down, forever, I think." Kiava then said, "State inspectors also think the ride is too dangerous."

The record easily establishes that this statement, the Too Dangerous Statement, was false. Kiava testified that she got the statement from producer Kelly Dearing–Smith who told her that she had spoken to state ride inspectors at the Department of Agriculture and the inspectors had told Dearing–Smith that the Starchaser ride was too dangerous. However, Dearing–Smith testified that she did not know the source of this information. Roger Nesbitt, the Communications Director of the Department of Agriculture testified that he had no knowledge of any ride inspector making the Too Dangerous Statement. In addition, Carl Dills, the State of Kentucky's chief ride inspector testified that he did not tell anyone from WHAS–TV that this ride was too dangerous and further stated that he had no knowledge of anyone from the Department of Agriculture saying that the ride was too dangerous. In fact, Dills testified that he rode the ride "all the time myself." And finally, WHAS–TV's corporate representative at trial testified that the Too Dangerous Statement was inaccurate and that he believed a retraction should have been issued.

After reviewing the record, I also believe that the circumstantial evidence demonstrated that there was clear and convincing evidence of actual malice. The evidence described above establishes that (i) no one at WHAS–TV claimed to have spoken to any state inspector that made a statement that resembled the Too Dangerous Statement; (ii) the Department of Agriculture had no knowledge of anyone making such a statement; and (iii) WHAS–TV's corporate representative admitted that the statement was inaccurate and should have been retracted. In addition, WHAS–TV's actions after the July 27, 1994 telecast demonstrate at least a reckless disregard of the truth. Roger Nesbitt called WHAS–TV on July 29, 2004 and spoke to Dearing–Smith about the July 27, 1994 telecast. On that day, Dearing Smith flagged the script surrounding the Too Dangerous Statement. Dearing also prepared an internal memorandum that was introduced at trial. It states:

TO: NICK

FROM: KELLEY DEARING

RE: KENTUCKY KINGDOM PHONECALL

I HAPPENED TO PICK UP A CALL FOR LISA KIAVA SEVERAL DAYS AFTER THE KENTUCKY KINGDOM ACCIDENT. WHEN I TOLD THE CALLER LISA WAS NOT HERE TODAY AND ASKED IF I COULD

HELP, HE IDENTIFIED HIMSELF AS BEING WITH THE STATE DEPARTMENT THAT INSPECTS RIDES. I CANNOT REMEMBER HIS NAME.

HE SAID HE WAS CALLING WITH A CONCERN OVER A STORY WE RAN ON THE ACCIDENT. HE SAID SOMEONE WITH KENTUCKY KINGDOM HAD CALLED HIM. HE SAID WE HAD REPORTED THAT STATE INSPECTORS SAID THE RIDE HAD "MALFUNCTIONED". HE WENT ON TO SAY THAT STATE INSPECTORS HAD NOT SAID THAT—AND HE WANTED TO KNOW WHO WE HAD SPOKE WITH. AT THIS POINT—I TOLD HIM I WOULD TRY TO GET TO THE END OF THE PROBLEM. I LEFT A MESSAGE ON LISA KIAVA'S ANSWERING MACHINE, EXPLAINING THE NATURE OF THE CALL.

AFTER THE CALL, I WENT INTO THE ARCHIVE SCRIPT TO LISA'S STORY AND PUT A NOTATION IN THE SCRIPT THAT SAID "DO NOT REPORT, ACCURATE? ? ?" TO LET OTHERS LOOKING FOR FILE INFORMATION NOT REPEAT THE SAME WORDING UNTIL THIS PROBLEM WAS SOLVED.

THANKS.

KELLEY DEARING

Dearing–Smith testified that the source for the Too Dangerous Statement was never verified. Instead of making inquiry into this issue, WHAS–TV ran the Too Dangerous Statement the next day. In addition, from May 19, 1996 through May 22, 1996, WHAS–TV aired a four part series of investigative reports from reporter Doug Proffitt about the Starchaser accident. At the end of each of these lengthy segments, Proffitt read a statement that noted Kentucky Kingdom had filed a lawsuit about the 1994 telecasts and then he stated that the 1994 stories were true. Proffitt testified that he had not seen the original stories and the executive news director had prepared the statement.

After conducting the independent review that is mandated by *Bose,* I conclude that the clear and convincing evidence established that the Too Dangerous Statement was made with actual malice because the evidence shows that the statement was made with the knowledge that it was false or with the reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

### Substantial Truth

I believe that the majority is incorrect in its analysis of substantial truth. The majority claims that this doctrine "is a convenient and necessary phrase invented by lawyers and judges to apply in very narrow and limited circumstances and relates only to incidental information and not to essential content." Ante at 791–92. In fact, this doctrine goes to the heart of protecting First Amendment principles. In *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), the United States Supreme Court explained that one method of analyzing whether the statements were made with actual malice is to determine whether they were "substantially true" despite the fact that they may be technically false because they are not literally true.

The constitutional question we must consider here is whether ... the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity. This inquiry in turn requires us to consider the concept of falsity; for we cannot discuss the standards for knowledge or reckless disregard without

some understanding of the acts required for liability.... We ... must determine what, in addition to this technical falsity, proves falsity for purposes of the actual malice inquiry. *Id.* at 513–514, 111 S.Ct. 2419, 2431. The Court went so far as to expressly note that "[o]ur definition of actual malice relies upon th[e] historical understanding" of the substantial truth doctrine. *Id.* at 517, 111 S.Ct. at 2433. Clearly, in a case that involves comments about a public figure by a media defendant, substantial truth is not a "narrow and limited" doctrine but a constitutional doctrine.[3] I would also note that this means that the substantial truth doctrine is more appropriately applied as part of a court's actual malice review or by the trial court at the summary judgment stage. *See Bell v. Courier–Journal & Louisville Times Co.*, 402 S.W.2d 84 (Ky. 1966) (applying substantial truth doctrine at the summary judgment stage).

I do not believe it is error to instruct the jury on falsity alone. The vast majority of courts that have been presented with "falsity" (as opposed to the "substantial truth") instructions have tacitly approved those instructions. See, e.g., *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (failing to find error in a falsity instruction). In fact, I have been able to find only one case that has expressly required the use of a substantial truth instruction. *See Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 707 (Fla. Dist.Ct.App.1999) (reversing because "the trial court was incorrect in finding that 'substantial truth' should not be presented to the jury"). Thus, I conclude that it is not *required* that the jury be instructed as to substantial truth—an instruction as to falsity is sufficient. However, I believe it is better practice for the jury to be instructed that for purposes of the falsity of the statements, "false" means "not substantially true." Though such an instruction is not required, it would allow for a more robust presentation of the substantial truth defense by the defendant.

Finally, I think that the implied libel instructions were erroneous, and I join Part III.B. of Justice Cooper's dissenting opinion. And since the jury did not return a damage award on each specific statement, the judgment should be remanded for a trial on damages as to the Too Dangerous Statement.

---

3. This is not to say that the substantial truth doctrine does not have common law roots. In fact, substantial truth still plays an important, but distinct, role as a defense in common law defamation. *See* Robert D. Sack, *Sack on Defamation* § 3.7 (Practicing Law Institute 2004).