**ETHLYN JOSEPH, Appellant/Plaintiff**

**v.**

**DAILY NEWS PUBLISHING COMPANY, INC., LEE WILLIAMS, JANE LOWE DAVIS, and SINCLAIR CRABB, Appellees/Defendants**

S. Ct. Civil No. 2009-0015

Supreme Court of the Virgin Islands

October 31, 2012

569

571

Lee J. Rohn, Esq., Rohn & Carpenter, LLC, St. Croix, USVI, K. Glenda Cameron, Esq., Law Offices of K.G. Cameron, St. Croix, USVI, *Attorneys for Appellant.*

573

KEVIN A. RAMES, ESQ., Law Offices of K.A. Rames, P.C., St. Croix, USVI, NATHAN E. SIEGEL, ESQ., MICHAEL D. SULLIVAN, ESQ., Levine Sullivan Koch & Schulz, L.L.P., Washington, D.C., *Attorneys for Appellees Daily News Publishing Company, Inc. and Jane Lowe Davis.*

HOLLAR, *Designated Justice*; STEELE, *Designated Justice*; and WILLOCKS, Designated Justice.[1]

## OPINION OF THE COURT

(October 31, 2012)

HOLLAR, *Designated Justice*. Appellant Ethlyn Joseph ("Joseph") appeals from the Superior Court's January 22, 2009 Opinion and Order,[2] which entered summary judgment in favor of the Daily News Publishing Company, Inc. ("Daily News") and various other defendants (collectively "Defendants"). For the reasons that follow, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This appeal arises from several newspaper articles published by the Daily News in late March 2004, most of which were authored by Lee Williams ("Williams") and edited by Jane Lowe Davis ("Davis"). These articles all related to Joseph's tenure as the Director of Environmental Health at the Virgin Islands Department of Health and, among other things, stated that Joseph had been accused of taking bribes and engaging in other corrupt activities. On September 20, 2004, Joseph filed suit against the Daily News, Williams, and Davis, as well as Sinclair Crabb ("Crabb"), a restaurant owner, who served as a source for some of the statements in the articles. Additionally, Joseph sued Innovative Communication Corporation ("ICC"), the entity that owned the Daily News at the time the articles were published. In her complaint, Joseph asserted causes of action for defamation, breach of the duty of good faith,

---

[1] Chief Justice Rhys S. Hodge and Associate Justices Maria M. Cabret and Ive Arlington Swan are recused from this matter. The Honorable Brenda J. Hollar, the Honorable Patricia D. Steele, and the Honorable Harold W.L. Willocks have been designated in their place pursuant to title 4, section 24(a) of the Virgin Islands Code.

[2] Although signed by the Superior Court judge on January 21, 2009, the Clerk of the Superior Court did not enter the order until January 22, 2009. *See* V.I.S.CT.R. 5(a)(9) ("A judgment or order is entered within the meaning of this Rule when it is entered on the docket in compliance with Superior Court Rule 49.").

and intentional or negligent infliction of emotional distress, and requested a punitive damages award.

The first newspaper articles containing disparaging accounts of Joseph's professional conduct appeared in the March 23, 2004 edition of the Daily News. Appearing on the first page of an article entitled, "Allegations of Corruption Taint Restaurant Inspections," Williams wrote, "[s]ome local restaurant owners say" Joseph "is extorting cash by threatening to close their businesses for questionable health code violations unless they pay her off," that Joseph "refused Daily News' requests for an interview about the allegations," and that "Health Department workers and other government officials confirmed the restaurateurs' allegations." (J.A. 333.) The article went on to say that "[t]he government workers described to The Daily News 'cash runs' during which Joseph has stopped at several restaurants during the course of an afternoon, collecting envelopes containing $100 bills and gold jewelry." (J.A. 333.)

Continued on page three, recaptioned under the heading, "Corruption Cripples Inspection Process, Employees Say," the article reported that V.I. Health Department employees had said that "at times, restaurant inspections found major health violations — violations serious enough to close the restaurant — but Joseph met with restaurant owners behind closed doors and she nixed any citations." (J.A. 335.) Elaborating further, the article stated, that "[r]estauranteurs, V.I. Health Department employees and other government officials described numerous allegations of extortion and corruption to The Daily News," and that "[t]hey said most of the businesses Joseph targets are owned by down-islanders, Arabs, Dominicanos, Asians and other minorities who are unlikely to turn to the authorities for help." (J.A. 335.) The same article also identified Joseph as the "first cousin" of Governor Charles Turnbull, and stated that she "was appointed to the position after Turnbull was elected governor in 1999." (J.A. 335.) Included in the article were quotations from Crabb, who stated that Joseph forced his restaurant to close for two weeks for health code violations, but that "[s]he said I needed to pay her some money under the table to keep her off me." And ultimately, he "paid her twice." (J.A. 335.)

On page four, the article — now entitled "Inspections Chief Fails to Follow V.I.'s Legal Standards" — stated that "Crabb told The Daily News he had to pay Joseph less than $500, but the owner of Brooks Bar and

Restaurant said Joseph asked her for $2,000" and that the owner said that when she "refused to pay, Joseph ordered the restaurant near Magens Bay shut down immediately." (J.A. 336.) The article concluded by stating that "Joseph routinely waives and voids fines on restaurants, employees said, even though she lacks the authority to do so," that she "levies amounts that vary widely from the fine schedule established by territorial law," "failed to use federal grant money earmarked to send Environmental Health Inspectors to stateside training in inspecting school lunch preparation," "has no schedule for inspecting restaurants," "has not established a clear policy for conducting an inspection," and that "[t]he division is short-staffed with two of the six inspector positions vacant, but Joseph allows only two inspectors to work outside the office" and "has ordered the other two inspectors to sit at their desks, doing no work, as punishment for refusing to follow her directives." (J.A. 336.) Citing specifics, the article reported that "[i]n one case, the employees said, Joseph told the employee to falsify the division's annual report by using a fictitious number for the amount of revenue the division collected in 2003," and "[w]hen the employee balked . . . Joseph assigned that employee to sit at a desk and do nothing." (J.A. 336.) In a separate article, but published on the same day and entitled "No Bribes, No Business," there were several additional statements attributed to Crabb. He reportedly stated that he would "give [Joseph] free plates of food and $200 a month, but not every month," and that his "problems with Joseph began after he fired her godson, who had been a cook at the restaurant." (J.A. 334.)

On March 24, 2004, the Daily News printed, as a sequel, another article entitled "Carty Calls for Probe of Chief V.I. Restaurant Inspector," which reported that Darlene Carty, the Virgin Islands Health Commissioner, directed the Office of the Inspector General to investigate the complaints against Joseph. (J.A. 337.) This article briefly summarized some of the statements made in the March 23, 2004 articles, including that "Health employees and local restaurant owners have accused Joseph of demanding money under the table and punishing restaurants with heavy fines and closure if they did not pay her," that Joseph preferred to target minority-owned restaurants, and that Joseph was Governor Turnbull's first cousin. (J.A. 337.) The article added that Joseph grew up in the same household as Turnbull. It further stated that the Daily News had received phone calls and faxes from other restaurant owners from whom Joseph

576

had also extorted money. (J.A. 337.) Additionally, a statement attributed to one such restaurant owner said that Joseph is "taking money with one hand and turning a blind eye to seriously dangerous health situations with the other." (J.A. 337.) The same article included a written statement by Joseph issued the prior day, which denied the accusations, but which the article characterized as "not address[ing] the specific allegations or clarify[ing] her current status with the department." (J.A. 337.)

Subsequent articles published by the Daily News by a different reporter — Joy Blackburn — focused on the government response to the allegations in the prior articles. In an article entitled "Carty Slams Restaurateur who Charged Corruption," published on March 26, 2004, The Daily News reported that Commissioner Carty had released a statement claiming that over the past three years Crabb's restaurant had been cited for a number of sanitary violations and had been closed for noncompliance, and that Crabb's allegations against Joseph "lacked substantiated corroborative evidence." (J.A. 338.) Included in the article was Crabb's response, in which he maintained that the violations never existed and that the statement was intended to discredit him. (J.A. 338.) Another article, published on March 27, 2004, reported that Commissioner Carty had recommended that Joseph be placed on paid leave pending the outcome of an internal investigation, and in a March 30, 2004 article, it was reported that Governor Turnbull had reassigned Joseph to a different position, effective immediately. (J.A. 339-40.) A government spokesperson, in that same article, denied prior reports that Joseph was Governor Turnbull's first cousin and that they grew up in the same household. Instead, the spokesperson suggested that "Joseph can at best be characterized as a distant relative to the governor." (J.A. 340.) Finally, an article published on March 31, 2004, entitled "Inspector General has no Money to Probe Restaurant Inspections," reported that the Office of the Inspector General was not sure if it would investigate the allegations against Joseph because of a lack of resources. (J.A. 341.) All of the follow-up articles reiterated the allegations first reported in the March 23, 2004 articles, that Joseph had used her position to extort money.

On September 20, 2004, Joseph filed a complaint against the Daily News and others for, *inter alia*, defamation. On October 29, 2004, a First Amended Verified Complaint was filed and thereafter a Scheduling Order setting forth discovery and motion practice deadlines was entered on

February 23, 2006. On February 14, 2007, a settlement was entered between Joseph and Crabb. On July 25, 2007, the Daily News and Jane Lowe Davis moved for summary judgment,[3] primarily on the grounds that Joseph had failed to produce any evidence of actual malice. Over the course of the next several months Joseph filed numerous motions not directly pertinent to this appeal including requests to extend the time to respond to the summary judgment motion, and enlarge discovery deadlines. Ultimately, Joseph filed her opposition to the summary judgment motion on March 7, 2008. The Superior Court granted the summary judgment motion on January 22, 2009 and dismissed her claims with prejudice. Joseph filed a timely notice of appeal on February 4, 2009.

## II. APPELLATE JURISDICTION

■■ "The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4 § 32(a). "Section 32 embodies the final judgment rule, which generally requires a party 'to raise all claims of error in a single appeal following final judgment on the merits.' " *Bryant v. People*, 53 V.I. 395, 400 (V.I. 2010) (quoting *Enrietto v. Rogers Townsend & Thomas PC*, 49 V.I. 311, 315 (V.I. 2007)). This Court has consistently held that *when the Superior Court dismisses all causes of action with respect to some — but not all — defendants in a multi-defendant litigation, that order is typically not final*, and thus no appeal may be entertained as a matter of right until a judgment is entered adjudicating all claims with respect to all defendants. *See Pickard-Samuel v. Gov't of the V.I.*, S.Ct. Civ. No. 2008-0031, 2010 V.I. Supreme LEXIS 19, at *5 n.5 (V.I. June 4, 2010) (unpublished); *Hagley v. Hendricks*, S.Ct. Civ. No. 2007-0026, 2007 V.I. Supreme LEXIS 8, at *9 (V.I. Dec. 28, 2007) (unpublished).

But, in some exceptional cases, an appeal from an order that only explicitly resolves some claims or some defendants may proceed — for

---

[3] Although filed on behalf of the Daily News and Davis, the motion noted that Joseph never served Williams with her complaint and that a petition for involuntary bankruptcy had been filed against ICC, which resulted in an automatic stay with respect to any claims against it. Given the status of Williams and the ICC, the motion informed the Superior Court that "a judgment on the merits for the [Daily News and Davis] would be equally applicable to all defendants." (J.A. 119.)

instance, if the Superior Court intended for its decision to end the litigation. *See First Am. Dev. Group/Carib, LLC v. WestLB AG*, S.Ct. Civ. No. 2012-0023, 2012 V.I. Supreme LEXIS 39, at *7 (V.I. Apr. 30, 2012) (unpublished) (identifying five factors that weigh in favor of treating technically non-final judgment as a final judgment); *cf. Davis v. Allied Mortg. Capital Corp.*, 53 V.I. 490, 499 (V.I. 2010) ("[I]n determining whether the Superior Court ruled on the counterclaim, this Court does not consider whether the Superior Court followed the correct procedure in disposing the counterclaim, but only whether its intent to end the entire litigation was readily apparent.").

Although the January 22, 2009 Opinion and Order might not technically constitute a final judgment within the meaning of section 32, the actions of the parties and applicable case law support its being treated as a final judgment. As noted earlier, Williams and ICC did not join in the July 25, 2007 motion for summary judgment, and the Superior Court acknowledged in the first sentence of its January 22, 2009 Opinion that the motion had been brought solely by the Daily News and Davis. (J.A. 5.) However, both the Opinion and the accompanying Order contain ambiguous language, in that they state that "Defendants' Motion for Summary Judgment is GRANTED" and that "Plaintiff's claims are dismissed with prejudice" without expressly stating whether the Superior Court intended to dismiss all claims against all defendants, or only those claims against the Daily News and Davis. (J.A. 33, 35.) Importantly, the certified docket sheet does not contain any indication that the Superior Court ever formally dismissed the claims against Williams for lack of service, stayed the proceedings against ICC, *sua sponte* entered summary judgment in favor of Williams and ICC for the same reasons it granted the motion for summary judgment filed by the Daily News and Davis, or directed the Clerk of the Superior Court to close the case file.

■ Nevertheless, we hold that we possess jurisdiction over Joseph's appeal. Typically, this Court resolves such ambiguities in favor of jurisdiction. *See, e.g., Brown v. People*, S.Ct. Crim. No. 2007-0063, 2010 V.I. Supreme LEXIS 74, at *11 (V.I. Sept. 27, 2010) (unpublished); *Vazquez v. Vazquez*, 54 V.I. 485, 491 n.3 (V.I. 2010). Although the January 22, 2009 Opinion and Order are subject to more than one interpretation, the parties and the Superior Court have proceeded as if the decision were final. In fact, at no point has Joseph ever disputed the claim in the July 25, 2007 motion that — if summary judgment is justified with respect to the

Daily News and Davis — it would also be warranted as to Williams and ICC for the same reasons, and there is nothing in the January 22, 2009 Opinion and Order, other than the ambiguous references to "Defendants" and "Plaintiff's claims," that could be construed as permitting Joseph's claims against Williams and ICC to proceed. *Cf. Davis*, 53 V.I. at 500-01 (holding Superior Court did not implicitly deny defendant's counterclaim when entering summary judgment on plaintiff's claim when order granting summary judgment contained language that would not necessarily have precluded defendant from pursuing the counterclaim). Therefore, while the better practice would have been for the Superior Court to (1) first adjudicate the claim that Williams should be dismissed from the litigation because he was not properly served and determine whether all proceedings against ICC should be stayed, (2) resolve the summary judgment motion on the merits, and only then (3) if appropriate, *sua sponte* enter summary judgment in favor of Williams and ICC because the same reasoning barred Joseph's claims against those defendants,[4] we interpret the January 22, 2009 Opinion and Order as entering summary judgment in favor of the Daily News, Davis, Williams, and ICC, since the Superior Court clearly intended to dismiss the entire case when it announced its decision.

---

[4] This Court is particularly concerned about the Superior Court's failure to rule on Williams's motion to be dismissed for lack of service because service of process — unless waived by a general appearance — is a prerequisite to the Superior Court obtaining personal jurisdiction over a defendant. *See* 5 V.I.C. § 115 ("From the time of the service of the summons . . . the court shall be deemed to have acquired jurisdiction and to have control of all the subsequent proceedings. A voluntary appearance of the defendant shall be equivalent to personal service of the summons upon him."); *see also In re Najawicz*, 52 V.I. 311, 338 (V.I. 2009). At first glance, it may appear that dismissing Williams for failure to effectuate service and entering summary judgment in favor of Williams on the merits have the same effect, in that both terminate Williams' involvement in the litigation. However, "a dismissal for failure to state a claim is with prejudice whereas a dismissal for lack of jurisdiction is without prejudice," which "counsels against bypassing the jurisdictional issue." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997). Importantly, a dismissal on the merits precludes subsequent litigation — whether in the Virgin Islands or another jurisdiction — pursuant to the principle of *res judicata*, whereas the same is not true if a cause of action is dismissed solely for lack of service. *See Smith v. Turnbull*, 54 V.I. 369, 375 (V.I. 2010). Given the jurisdictional significance of service of process, as well as the differing treatment of jurisdictional dismissals as contrasted to merits dismissals, the Superior Court is advised to rule on motions to dismiss for lack of service prior to any motions that seek to resolve the litigation on the merits.

## III. STANDARD OF REVIEW

In the matter *sub judice*, this Court is tasked with reviewing a Superior Court decision granting summary judgment in favor of defendants in an action for defamation brought by a public official. Specifically, because Joseph is a public official, this Court must determine whether the trial court properly found that Joseph failed to prove that the defendants acted with "actual malice." *See* Section IV.B. *infra*. The applicable standard of review in such a case is derived from both the traditional standard of review for summary judgment, and the standard of review for a defamation action brought by a public official regarding a matter of public concern.

With respect to this Court's review of summary judgment decisions, our review is plenary. *See Williams v. United Corp.*, 50 V.I. 191, 194 (V.I. 2008) (citing *Maduro v. American Airlines, Inc.*, S.Ct. Civ. No. 2007-0029, 2008 V.I. Supreme LEXIS 24, at *7 (V.I. Feb. 28, 2008) (unpublished)). "On review, we apply the same test that the lower court should have utilized." *Id.* "Because summary judgment is a drastic remedy, it should be granted only when 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Id.* (quoting former wording of FED. R. CIV. P. 56(c)).[5] "When reviewing the record, this Court must view the inferences to be drawn from the underlying facts in the light most favorable to the non-moving party, and we must take the non-moving party's conflicting allegations as true if 'supported by proper proofs.' " *Joseph v. Hess Oil V.I. Corp.*, 54 V.I. 657, 664 (V.I. 2011) (quoting *Williams*, 50 V.I. at 194-95 (V.I. 2008)). "[T]o survive summary judgment, the nonmoving party's evidence must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Id.* (internal quotation marks omitted).

Because the particular summary judgment decision under review concerns the First Amendment protections afforded to defendants in the

---

[5] The language of FED. R. CIV. P. 56(c) was amended in 2010 in part to provide more detail regarding the types of record materials that a party may use to support its factual position. *See* FED. R. CIV. P. 56 advisory comm. nn. (West 2012). The difference is immaterial to the matters here under review.

context of a defamation action brought by a public official, the independent examination rule espoused by the Supreme Court in *New York Times Co. v. Sullivan* is also implicated. "The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984). Under this rule, appellate judges "must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars entry of any judgment that is not supported by clear and convincing proof of actual malice." *Id.* at 510. Where the trial court or jury has made findings of fact upon which the ultimate judgment relies, application of the independent examination rule can, in certain instances, force appellate courts into the precarious position of balancing the common law rule that findings of fact may only be set aside if "clearly erroneous," with the constitutional requirement that a reviewing court must "make an independent examination of the whole record to ensure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp.*, 466 U.S. at 499 (internal citations omitted) (quoting *New York Times Co. v. Sullivan*, 376 U.S. at 284-86).[6] In the

---

[6] The *Bose* Court, however, insists that "[t]he conflict between the two rules is in some respects more apparent than real." *Bose Corp.*, 466 U.S. at 499. The conflicting standards — the traditional approach favoring clear error review and the independent examination rule — further implicate the problematic task of classifying certain issues as questions of fact, questions of law, and questions of mixed fact and law. The traditional approach limits the scope of appellate review of findings of fact, allowing reviewing courts to overturn a decision only where such findings were "clearly erroneous." The independent examination rule, on the other hand, requires the appellate courts to review a trial court's findings of fact — and to potentially make their own competing findings of fact — to ensure that they are consistent with the precepts of the applicable substantive law. The *Bose* Court provides ample justification for departing from the traditional clear error standard of review. It claims, as noted, that the conflict between the rules is not as stark as it seems. *Id.* at 499 (stating that Federal Rule of Civil Procedure 52(a) "never forbids such an [independent] examination . . . indeed [the] seminal decision on the Rule expressly contemplated a review of the entire record, stating that a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made"). The Court also contends that "findings of fact" are often so intertwined with the applicable standard of law as to render the facts subject to independent examination and removes them from the restrictive analysis dictated by the clear error standard of review. *Id.* at 501. It goes on to explain that often, when the court is faced with the task of drawing a line between questions of fact, subject to clear error review, and questions of law, subject to independent examination, the determination of where to draw the line "varies according to

context of summary judgment, however, where the trial court is prohibited from weighing evidence and making findings of fact[7] no such conflict exists because no findings of fact exist in the trial court record.[8]

---

the nature of the substantive law at issue." *Id.* at 501 n.17. According to the *Bose* Court, it is in the realm of constitutional protections that an appellate court's "role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance." *Id.* at 503. With respect to First Amendment cases in particular, the *Bose* Court asserted that "the Court has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Id.* at 505. Ultimately, the Court concluded that, in cases where the constitutional perimeters of protected speech were at issue, even when questions reviewed were "essentially questions of fact," the Court had long recognized the "ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." *Id.* at 506 (quoting *Miller v. California*, 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973)). Thus despite the *Bose* Court's homage to the clear error standard, and its exposition on line drawing between questions of law and fact, it held finally that, in cases where the contours of First Amendment protections were at stake, appellate courts have a duty to independently review findings of fact in order to ensure that constitutional principles are adequately protected. *See id.* at 508.

[7] *See* FED. R. CIV. P. 56.

[8] At least one commentator has suggested that, even in the context of summary judgment, appellate courts should supplant the normal standard of review with a more stringent standard based on the independent examination rule. *See* Levine, *Judge and Jury in the Law of Defamation: Putting the Horse Behind the Cart*, 35 AM. U. L. REV. 3, 72 (1985). Specifically, Levine claims that appellate courts should draw their own inferences in the summary judgment context. *Id.* However, this Court is not swayed by Levine's construal of the interaction between the summary judgment and independent examination standards. The heightened review dictated by the independent examination rule and the holding in *Bose Corp.* are predicated upon the gravity of decisions regarding First Amendment protections. This Court is satisfied that the constitutional protections at issue are adequately protected by the summary judgment standard for "actual malice" which "requires that the evidence be sufficient to prove actual malice by clear and convincing evidence." Tigran W. Eldred, *Amplifying Bose Corp. v. Consumers Union: The Proper Scope of Appellate Review in Public Person Defamation Cases*, 57 FORDHAM L. REV. 579, 594 n.118 (1989). Supporting this Court's position, the Ninth Circuit has held that to construe a conflict between the traditional procedural rules for summary judgment and the independent examination rule "conflates the summary judgment standard of review with application of the *New York Times* standard and, as a result, impermissibly weighs evidence at the summary judgment stage." *Suzuki Motor Corp. v. Consumers Union of the United States, Inc.*, 330 F.3d 1110, 1132 (2003). Instead, a proper construal of the independent examination rule in the context of summary judgment simply requires that appellate courts " 'exercise [their] independent judgment' in evaluating the lower court's opinion, rather than granting it any deference." *Id.* (quoting *Bose Corp.*, 466 U.S. at 514).

When reviewing a summary judgment decision to which the independent examination rule applies, an appellate court must apply that rule to the normal standard of review for summary judgment. The result is simply that the reviewing court *independently* performs the same summary judgment analysis required of the trial court, without giving any deference to the trial court's decision. *See, e.g., Suzuki Motor Corp. v. Consumers Union of the United States, Inc.*, 330 F.3d 1110, 1132-33 (2003); *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899, 907-08 (2007); *see also* Tigran W. Eldred, *Amplifying Bose Corp. v. Consumers Union: The Proper Scope of Appellate Review in Public Person Defamation Cases*, 57 FORDHAM L. REV. 579, 594 n.118 (1989). At the trial phase, according to *Anderson v. Liberty Lobby*, "where the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's inquiry as to whether a genuine issue of material fact exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." 477 U.S. 242, 255-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In the context of the underlying defamation action brought by a public official regarding a matter of public concern, the question becomes "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* The imposition of the independent examination rule merely allows this Court, as the reviewing Court, to perform the same analysis *de novo* (*i.e.*, to perform the analysis independently, without deference to the decision of the trial court), and does not require that this Court make any factual findings or weigh the evidence in the record. As the Ninth Circuit has recognized, the independent examination rule "is consistent with . . . well established procedural rules governing review of summary judgment motions on the actual malice issue and does not require us to discard the procedural rules designed to preclude the resolution of disputed factual issues at the summary judgment stage." *Suzuki Motor Corp.*, 330 F.3d at 1132-33. This Court will thus independently review the entire record, without weighing evidence or making factual findings, to determine whether a genuine issue of material fact exists regarding the question of whether the record could support a reasonable jury finding of actual malice by clear and convincing evidence.

584

**IV. ANALYSIS**

■ To determine if there is a genuine issue of material fact as to whether a reasonable jury could find that Joseph has proved "actual malice" by clear and convincing evidence, the Court must perform a *de novo* review of the evidence of record and apply the appropriate substantive legal standards to that evidence. *See* Section III *supra.* Because the Superior Court's summary judgment decision was based on the absence of "actual malice," before subjecting the record to a proper analysis under the actual malice standard, the Court feels it necessary to clarify the law of defamation within the Territory of the Virgin Islands. To accomplish this, the Court will: (1) provide the elements for a claim of general defamation in this jurisdiction; (2) highlight the unique aspects of a claim of defamation brought by a public official regarding a matter of public concern;[9] (3) describe the clear and convincing evidentiary standard applicable to the "actual malice" element of a defamation claim brought by a public official regarding a matter of public concern; and finally (4) independently review the evidence to support the ultimate conclusion that Joseph has failed to demonstrate the existence of a genuine issue of material fact as to whether a reasonable jury could find that defendants acted with actual malice by clear and convincing evidence.

### A. Elements of a Claim of General Defamation in the Territory of the Virgin Islands

■ ■ This Court has adopted the basic elements for a claim of defamation set forth in the Second Restatement of Torts.[10] *See Kendall v.*

---

[9] Joseph has not disputed, in either the proceedings before this Court or the Superior Court, that she was a public official at the time the March 23, 2004 through March 31, 2004 articles were published by virtue of her position as Director of Environmental Health. Accordingly, as a public figure, she may not recover damages unless she proves by clear and convincing evidence that the "false statement was made with actual malice — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 659, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989).

[10] The Superior Court applied the Restatement to this dispute by virtue of title 1, section 4 of the Virgin Islands Code, which provides that "[t]he rules of the common law, as expressed in the restatements of the law approved by the American Law Institute . . . shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of

*Daily News Pub. Co.*, 55 V.I. 781, 787 (V.I. 2011). The first element is "a false and defamatory statement concerning another." RESTATEMENT (SECOND) OF TORTS § 558(a). The truth or falsity of a statement is generally a question of fact for the jury, and statement or communication is only defamatory if "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." RESTATEMENT (SECOND) OF TORTS § 559.

■ The second element is "an unprivileged publication to a third party." RESTATEMENT (SECOND) OF TORTS § 558(b). "Publication" means the "communication intentionally or by negligent act to one other than the person defamed." RESTATEMENT (SECOND) OF TORTS § 557. There are two methods of publication: libel and slander. Libel is the "the publication of defamatory matter by written or printed words." RESTATEMENT (SECOND) OF TORTS § 568(1). Slander is the "publication of defamatory matter by spoken words." RESTATEMENT (SECOND) OF TORTS § 568(2). The term "unprivileged" refers to the alleged defamer's inability to demonstrate that he was in some way "privileged" to make the defamatory communication. The types of privilege defenses available fall into two categories, "absolute privileges," *see* RESTATEMENT (SECOND) OF TORTS §§ 583-592A, and "conditional privileges," *see* RESTATEMENT (SECOND) OF TORTS §§ 593-598. Privilege, however, can be abused in such a way as to subject to privileged defamer to liability despite his privilege. RESTATEMENT (SECOND) OF TORTS §§ 599-605A.

■ The third element can generally be described as "fault." The level of fault varies with the parties to the defamation action, but the Restatement employs the minimum standard in its general definition of defamation. That minimum standard is, "fault amounting to at least

local laws to the contrary." However, nearly three years later, this Court, in response to a certified question from the United States Court of Appeals for the Third Circuit, held

> that the adoption of section 21 of title 4 in 2004 supersedes and alters section 4 of title 1, which is one of the initial provisions of the Virgin Islands Code that were adopted in 1957, and that therefore this Court and — to the extent not bound by precedent, the Superior Court — may determine the common law without automatically and mechanistically following the Restatements.

*Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 979 (V.I. 2011) (citations omitted). Applying the three non-dispositive *Banks* factors, we see no reason to depart from our decision in *Kendall* to follow the approach set forth in the Second Restatement.

negligence on the part of the publisher." RESTATEMENT (SECOND) OF TORTS § 558(c). It is the element of fault that is given a higher threshold when the defendant in a defamation action is a public official or public figure and the defamatory statements reference matters of public concern. *See* Section IV.B. *infra*. In the case of a defendant who is *not* a public figure or official, the minimum standard applies, and the defendant need prove only that the publisher acted *at least* negligently in failing to ascertain whether the statements concerning the defendant were true or false.

 The fourth element is "either the actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." RESTATEMENT (SECOND) OF TORTS § 558(d). The Restatement defines "special harm" as "the loss of something having economic or pecuniary value . . . [which] must result from the conduct of a person other than the defamer or the one defamed and must be legally caused by the defamation." RESTATEMENT (SECOND) OF TORTS § 575, cmt. b.[11] In essence, this element refers to two general categories of liability-producing statements. First, there are those that the Plaintiff is able to demonstrate caused him special harm. Second, there are those for which Plaintiff need not prove the existence of special harm because they are actionable on their face. This second category clearly begs the question, what makes a defamatory statement actionable on its face, or "actionable *per se*"? The answer to this question depends in part on whether the statement is either a libel or a slander. Specifically, "[o]ral defamation [i.e. slander] is tortious if the words spoken fall within a limited class of cases in which the words are actionable *per se*, or if they cause special damages. Written defamation [i.e. libel] is actionable *per se*." RESTATEMENT (SECOND) OF TORTS § 568 cmt. b. Thus, special damages need only be proven when the statement is slanderous and it does not fall into one of the limited classes of speech which is actionable

---

[11] Unlike other torts, this "special harm" assessment is not itself a calculation of damages. It is actually an element of the tort, the satisfaction of which must be established for there to be liability. Only after that liability is established does an assessment of actual damages become relevant.

*per se*. The classes of speech that are actionable *per se* are outlined in RESTATEMENT (SECOND) OF TORTS, §§ 570-574.[12]

## B. Unique Aspects of a Claim of Defamation brought by a Public Official Regarding a Matter of Public Concern

 The elements for a claim of defamation of a public official or public figure differ only with respect to the third element. Whereas in the case of a private individual the degree of fault need only rise to the level of negligence, in the case of a public official or public figure regarding a matter of public concern, a higher degree of fault is required to establish liability. Specifically, "one who publishes a false and defamatory communication concerning a public official or public figure in regard to his conduct, fitness or role in that capacity is subject to liability if, but only if, he (a) knows that the statement is false and that it defames the other person, or (b) acts with reckless disregard of these matters." RESTATEMENT (SECOND) OF TORTS § 580A. This disjunctive standard has been dubbed the "actual malice" standard by the United States Supreme Court. RESTATEMENT (SECOND) OF TORTS § 580A, cmt. d. The first prong requires evidence that the publisher was actually aware of the falsity of the statement, and with regard to the second "reckless disregard" prong of the standard, the Supreme Court of the United States has stated:

> A "reckless disregard" for the truth . . . requires more than a departure from reasonably prudent person conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. The standard is a subjective one — there must be sufficient evidence to permit the conclusion that the defendant actually had a high degree of awareness of probable falsity. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.

---

[12] This general outline of the relationship between libel, slander, and slander *per se*, and each category's effects on the requirement to prove "special damages," is simplified for the purposes of this discussion. For a more detailed discussion of how this simple scheme has potentially been called into question by *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), and the unclear, but likely ramifications of *Gertz*, see RESTATEMENT (SECOND) OF TORTS § 620, cmt. b, and § 621, cmt. b.

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (internal quotation marks and citations omitted). The source of the heightened "actual malice" standard is the First Amendment protection of free speech. This additional protection in the context of defamation "is held to be based on 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials.' " RESTATEMENT (SECOND) OF TORTS § 580A, cmt. a (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)).

 Because the "actual malice" standard is predicated specifically on the constitutional notion that public debate about public issues should not be unnecessarily curtailed, the Restatement does not apply the privilege to statements about public officials involving matters of private concern. A separate standard applies for such statements. In that instance, the standard is the same as if the defendant were merely a private individual. In the language of the Restatement:

> One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he (a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them.

RESTATEMENT (SECOND) OF TORTS § 580B. At first glance, it may appear as though this standard is not all that different from "actual malice," given that subparts (a) and (b) of this standard constitute the whole of the "actual malice" standard. However, this three-part standard is disjunctive, and only subpart (c) need be satisfied to establish defamation of a private individual or of a public official regarding matters of private concern. The standard is best defined by its least demanding definition — the general minimum standard of fault described earlier — "fault amounting to at least negligence on the part of the publisher." RESTATEMENT (SECOND) OF TORTS § 558(c). Although the Restatement makes clear that the plaintiff *may* prove his or her case by demonstrating the publisher's knowledge of the statements' falsity, or the publisher's reckless disregard as to the statement's truth or falsity, the

■■■■■■ · ■■■■■■■■■ ■■■■■■

public person plaintiff, regarding matters of private concern, *need* only demonstrate that the publisher was negligent in failing to ascertain the statement's truth or falsity. RESTATEMENT (SECOND) OF TORTS § 580B. Thus the standard is markedly less demanding than that of "actual malice."

### C. The Clear and Convincing Evidentiary Standard Applies to the "Actual Malice" Element of a Cause of Action for Defamation of a Public Figure Regarding Matters of Public Concern.

■■■ Because of the importance of the First Amendment free speech protections at stake, "not only does the plaintiff have the burden of raising the issue of knowledge or reckless disregard [i.e. actual malice] and of proving that the defendant's conduct was outside the scope of the constitutional protection, but the proof must be 'with convincing clarity.' " RESTATEMENT (SECOND) OF TORTS § 580A, cmt. f (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 514, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)). "This requirement, also described as one of 'clear and convincing proof,' is held to be imposed by the Constitution." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)). This increased evidentiary burden applies only to the element of "actual malice" in the context of a defamation claim against a public official regarding matters of public concern; "proof by more than a preponderance of the evidence has not been specifically required for any other factual issue in a defamation action." RESTATEMENT (SECOND) OF TORTS § 580A, cmt. f. The Restatement does note that the Supreme Court of the United States has suggested that in some contexts the heightened standard may be applied to the question of whether the statements were made "of and concerning the plaintiff." *Id.* This would only become a significant bar to recovery where the statements merely alluded to a plaintiff without actually mentioning him or her by name. This, of course, would be inapplicable to the case *sub judice*, where Defendant's name and unique position were clearly referenced. Thus, it is only with respect to the "actual malice" element that Joseph must satisfy the "clear and convincing" evidentiary standard, and similarly it is only with respect to "actual malice" that this Court must ensure that the heightened burden has been met.

## D. Independent Appellate Review of the Evidence Discloses Joseph's Failure to Demonstrate the Existence of a Genuine Issue of Material Fact as to Whether a Reasonable Jury Could Find that the Defendants Acted with "Actual Malice" by Clear and Convincing Evidence.

 Even granting the possibility that Joseph has demonstrated the existence of a genuine issue of material fact relative to elements one, two, and four of a defamation claim as described in Section IV.A. *supra*, she is barred from recovery as a result of her failure to establish "actual malice" by clear and convincing evidence.[13] The record simply cannot "support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 255-56. Even with all of the factual discrepancies identified in Joseph's brief resolved in the light most favorable to Joseph with the benefit of all reasonable inferences, the record is nevertheless bereft of any evidence that the Daily News or any of its agents authored or published the articles with a reckless disregard of whether they were false.

 As stated in Section IV.B. *supra*, to prove actual malice under a "reckless disregard for the truth" theory, a libel plaintiff possesses the burden of proving that the defendant possessed a "high degree of awareness of . . . probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). The "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," but by asking whether "the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* Thus, a defendant may rely on a single source to support the allegations in an article, so long as the defendant does not possess a serious doubt about the veracity of the statements. *Id.* at 732-33. For this same reason, the fact that a defendant was merely negligent, did not corroborate a statement with a second source, or did not follow accepted journalistic practices is — without more — irrelevant to the actual malice analysis. *See, e.g., Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) ("The Supreme Court has made clear that even an extreme departure from professional standards, without more, will not support a finding of actual

---

[13] The Court will thus refrain from engaging in an analysis of elements one, two, and four. This exercise of judicial restraint is supported by the fact that Joseph's appellate brief does not contend that any of these three elements need be reassessed.

malice.") (citing *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989)); *Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.*, 179 S.W.3d 785, 792 (Ky. 2005) ("Actual malice cannot be based solely on expert evidence that [a television station] deviated from accepted journalistic practices.").

Sinclair Crabb admitted, in a sworn affidavit, that he was a source for the Daily News articles on Joseph, and that all of the quotes attributed to him in the articles were accurate. (J.A. 1850.) The record contains absolutely no evidence that Williams, Davis, or any other individual involved with the publication of the articles had any reason to believe that Crabb's allegations about Joseph were false. She produced no evidence demonstrating that any of the Defendants entertained any serious doubts about the veracity of Crabb's accusations. Thus, whether or not Gonzalez or any other individual spoke with Williams is wholly irrelevant to the actual malice analysis, at least with respect to any statements for which Crabb served as a source. Likewise, whether or not Williams deviated from accepted journalistic standards is also irrelevant. Accordingly, Joseph cannot prove actual malice with respect to some of the most serious allegations — those offered by Crabb — that appeared in the March 23, 2004 articles, such as the claims that she was extorting cash from restaurant owners and receiving bribes.

A slightly more difficult question exists with respect to the portions of the articles for which Crabb was not a source, such as the claims that Joseph falsified a report, failed to properly use federal grant money, failed to establish standard operating procedures for inspections, had inspectors sit idle, and levied fines inconsistent with Virgin Islands law. Importantly, if one credits Gonzalez's testimony that she did not make any statements to the Daily News — which this Court must infer under the summary judgment standard[14] — then Johannes serves as the sole potential source for these allegations. Unlike Gonzalez, Johannes did not deny speaking

---

[14] The Defendants note in their appellate brief that Gonzalez's deposition testimony appears to contradict itself, in that throughout her deposition she denies speaking with the Daily News, but at one point states that she does not remember and that she may have sat in a conference room at the Daily News with Williams and Johannes. (Appellee's Br. 7.) However, this portion of Gonzalez's testimony was omitted from the Joint Appendix in this matter, contrary to Supreme Court Rule 24(a). Nevertheless, even if Gonzalez provided contradictory testimony, at the summary judgment stage, this Court is required to assume that the finder of fact would credit the portion of that testimony that is most favorable to Joseph — in this

with Williams; rather, she repeatedly testified that she could not remember whether she spoke with anyone affiliated with the Daily News, and admitted that she could have been the source for several of the statements.

 As a threshold matter, several courts have held that a witness's testimony that she cannot remember speaking to a reporter is different from an outright denial, and does not constitute evidence of actual malice. *See, e.g., Sunshine Sportswear & Electronics, Inc., v. WSOC Television, Inc.*, 738 F.Supp. 1499, 1508 (D.S.C. 1989) (holding, at summary judgment stage, that witness's deposition testimony that she could not remember whether she spoke to reporter was not evidence of actual malice); *Weingarten v. Block*, 102 Cal. App. 3d 129, 162 Cal.Rptr. 701, 716 (1980) (holding that the fact that two sources testified they did not remember statements attributed to them not proof of actual malice). We recognize that one could argue that Johannes's inability to remember, while not evidence of actual malice, might be sufficient for a jury to infer that Williams had no source for the allegations he attributes to Johannes. However, at the summary judgment stage, the non-moving party is only entitled to *reasonable* inferences, not unreasonable ones. *See, e.g., Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 32 (1st Cir. 2010); *ACT Inc., v. Sylvan Learning Systems, Inc.*, 296 F.3d 657, 666 (8th Cir. 2002). Although Johannes testified that she could not remember speaking to the Daily News, she testified to having observed first-hand virtually all of the allegations in the articles that Williams had attributed to her, and admitted that she had relayed this information to others, such as the Department of Justice. Thus, for Johannes's inability to remember to create a genuine issue of material fact as to whether she served as a source for Williams's articles, a finder of fact would have to either infer that Williams obtained the same information from another source — in which case there would be no actual malice — or that Williams falsified the information, yet somehow managed to fabricate a set of facts identical to those Johannes would testify to several years later at her deposition: a clearly unreasonable inference. *Cf. Gonzales v. Hearst Corp.*, 930 S.W.2d 275, 282-83 (Tex. App. 1996).

 Finally, we note that if a finder of fact were to hold that Gonzalez was not a source, it could also hold that some of the statements in the

case, that Gonzalez never spoke with the Daily News. *See Sealey-Christian v. Sunny Isle Shopping Center, Inc.*, 52 V.I. 410, 421-22 (V.I. 2009).

593

articles that used the plural form — i.e., "V.I. Health Department employees . . . described numerous allegations of extortion and corruption to The Daily News," (J.A. 335) — were only supported by a single source. Similarly, if the finder of fact credits Joseph's testimony that the deceased owner of Brooks Bar and Restaurant told her that she never spoke to the Daily News, it could potentially conclude that there was no source for the allegation that "the owner of Brooks Bar and Restaurant said Joseph asked her for $2,000" and that the owner said that when she "refused to pay, Joseph ordered the restaurant near Magens Bay shut down immediately." (J.A. 336.) But as the defendants note in their appellate brief, courts have held that, if a defendant is not liable for defamation for the main "gist" of an article or series of articles — regardless of whether the defendant is not liable because the statements are true or because the plaintiff failed to prove actual malice — the defendant is also not liable for minor inaccuracies in the same publications, even if those individual statements are false. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 508, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (holding, on state law grounds, that fake quotations attributed to defendant were not actionable given that quotations equally damaging to defendant's reputation were true); *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 176 (2d Cir. 2001) (holding no actual malice for false statements in article when statements were relatively minor part of article and plaintiff failed to prove actual malice for the main "gist" of the article). Applying this same reasoning, Joseph cannot recover for the reference to "V.I. Health Department employees" in the plural, the statement that bribes were solicited from the owner of Brooks Bar and Restaurant, or any other allegedly false or inaccurate statements collateral to the main thrust of the articles.[15]

---

[15] While not directly related to the actual malice inquiry, we note that Joseph's own attempt to hold the defendants liable for the report that Joseph is the first cousin of Governor Turnbull illustrates the importance of looking at the articles as a whole, rather than analyzing each allegedly false statement in a vacuum without any reference to broader context. As the Superior Court noted in its January 22, 2009 Opinion, the fact that Joseph is incorrectly identified as Governor Turnbull's first cousin should not, in and of itself, result in any harm to her reputation. (J.A. 20.) Rather, such a statement could only arguably have a defamatory meaning if, upon reading the entire article, a reader could conclude that Joseph retained her position as Director of Environmental Health despite the corruption allegations because of her familial relationship with the Governor.

## V. CONCLUSION

Although there is some uncertainty as to whether the Superior Court's June 22, 2009 Opinion and Order constitutes a final judgment, given the ambiguous language found in the documents, this Court possesses jurisdiction since it appears the Superior Court intended to dismiss the underlying action in its entirety. As to the merits, while the record contains some disputed facts, no genuine issue of material fact exists because even when the record is viewed in the light most favorable to Joseph, there is simply no evidence that Williams or any other defendant acted with actual malice with respect to the most serious allegations. While it is possible — again, viewing the evidence in the light most favorable to Joseph — that a finder of fact could conclude that some statements in the articles were unsubstantiated, the absence of actual malice for the main "gist" of the articles precludes holding any of the defendants liable for minor or collateral inaccuracies. Accordingly, we affirm the Superior Court's January 22, 2009 Opinion and Order.